518 F.Supp. 1350 (1981)
Leslie R. HINDS, Darlene Thomas, Crescencio S. Miranda, Daniel Gailliard and William S. Smith, Plaintiffs,
v.
CONSOLIDATED RAIL CORPORATION, Defendant.
Civ. A. No. 81-3.
Special Court, Regional Rail Reorganization Act.
July 22, 1981.
*1351 Robert A. Sedler, Detroit, Mich., and Harold M. Provizer, Southfield, Mich., for plaintiffs.
Harry A. Rissetto, Morgan, Lewis & Bockius, Washington, D.C., for defendant.
Raymond M. Larizza, Dept. of Justice, Washington, D.C., for intervenor United States.
Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.
WISDOM, Judge:
In this class action five plaintiffs attack the constitutionality of § 501 of the Staggers Rail Act of 1980, P.L. 96-448, 94 Stat. 1895 (1980) ("Staggers Act"). That section changes the method of calculating the employee income protection provided by § 505(b) of the Regional Rail Reorganization Act of 1973, P.L. 93-236, 87 Stat. 985 (1974), 45 U.S.C. §§ 701-794 (1976 & Supp. III 1979) ("RRR Act" or "the Act"). Each of the plaintiffs is a former employee of the Penn Central Railroad and each is now employed by Consolidated Rail Corporation (Conrail). They allege that each is a "protected employee" within the meaning of *1352 § 501 of the RRR Act.[1] A protected employee who is "deprived of employment or adversely affected with respect to ... compensation" as a result of the restructuring of the bankrupt railroads under the Act is entitled to receive from Conrail certain benefits, including "monthly displacement allowances" (MDAs) under § 505(b) of the Act. The RRR Act originally used a single formula to compute the MDAs of all protected employees. The Staggers Act amends § 505(b) to divide protected employees into four categories and provides a different method for calculating the MDAs for the members of each category. The plaintiffs allege that the deliberate effect of those amendments is to deny or substantially reduce the MDA entitlement of nonoperating employees (clerical workers, for example) and maintenance-of-way employees who continue to be employed by Conrail, while operating employees (train and engine crews) and employees not covered by a collective bargaining agreement (management) still in Conrail's employ continue to receive substantially the same guaranteed payments as before. The only issue in this case is whether this aspect of the Staggers Act discriminates between operating employees, on the one hand, and maintenance-of-way and nonoperating employees, on the other, in a way so lacking in rational justification as to violate the equal protection component of the due process clause of the fifth amendment.[2]
This court has exclusive subject matter jurisdiction over constitutional attacks on the Act under § 209(e)(1)(B) of the Act. See Consolidated Rail Corporation v. Hinds, 512 F.Supp. 1331 (Sp.Ct.R.R.R.A.1981), enjoining the plaintiffs from prosecuting this claim in the United States District Court for the Eastern District of Michigan.
The complaint asks for injunctive and declaratory relief. After filing its answer, Conrail filed a motion for summary judgment. The United States, intervening as of right to defend the constitutionality of this federal statute, filed a similar motion. The plaintiffs then cross-filed a motion for summary judgment. The court certified this case as a class action on the plaintiffs' unopposed motion.
We hold, and the parties agree, that there is no dispute as to any material fact. We grant the defendant's and the intervenor's motions for summary judgment; we deny the plaintiffs' motion for summary judgment. The Staggers Act establishes a rational classification system and is therefore not in violation of the fifth amendment.

I.
The threshold issue this case presents is the appropriate standard of judicial *1353 review. We conclude that when Congress enacts social welfare legislation such as the labor protection provisions of the Staggers Act, the statute in question can be held to violate the fifth amendment only if it is "patently arbitrary or irrational". United States Railroad Retirement Board v. Fritz, 449 U.S. 166, 176, 101 S.Ct. 453, 460, 66 L.Ed.2d 368, 377 (1980). "Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end." Id. 449 U.S. at 178, 101 S.Ct. at 461, 66 L.Ed.2d at 378.[3]
This minimal rationality standard imposes a heavy burden on the challengers to the Staggers Act. In Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), the Supreme Court observed:
In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." Lindsley v. National Carbonic Gas Co., 220 U.S. 61, 78 [31 S.Ct. 337, 340, 55 L.Ed. 369]. "The problems of government are practical ones and may justify, if they do not require, rough accommodations illogical, it may be, and unscientific." Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69-70 [33 S.Ct. 441, 443, 57 L.Ed. 730]. "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, 366 U.S. 420, 426 [81 S.Ct. 1101, 1105, 6 L.Ed.2d 393].
Dandridge involved a classification scheme for the award of social welfare benefits. The plaintiffs invoked the equal protection clause of the fourteenth amendment. The due process clause of the fifth amendment imposes no higher standard. Richardson v. Belcher, 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1971). Cf. Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 30 L.Ed.2d 884 (1954).
The plaintiffs accept the minimum rationality standard as applicable to this case, but contend that "there is no rational basis for distinguishing between the three generic classes of agreement employees with respect to the basic formulae for determining their compensation guarantees or for effectively denying supplemental income for protected nonoperating and maintenance-of-way employees while retaining it for protected operating employees."[4] Before applying the minimal rationality standard to § 501 of the Staggers Act, we take a brief look at the RRR Act.

II.
In 1973 the bankruptcy of certain major railroads in the Northeast and Midwest regions of the country threatened the national welfare; seven of the railroads, including the huge Penn Central system, were principally *1354 in the Northeast. Congress responded with the RRR Act, an innovative program designed to replace the inefficient, costly, often duplicative insolvent lines with a new and economically viable rail system.[5] The Act created Conrail, a private, for-profit corporation, to acquire substantial portions of the insolvents' railroad properties. Conrail now operates rail service over those properties in accordance with a "Final System Plan" drafted by United States Railway Association, a new entity established by the Act.
Title V of the Act protects those employees of the insolvent railroads whose employment was governed by a collective bargaining agreement from being "placed in a worse position with respect to compensation, fringe benefits, rules, working conditions, and rights and privileges pertaining thereto ...." RRR Act, § 505(a). That general guarantee was implemented by several specific benefit provisions. For example, Conrail was authorized to terminate employees with less than three years of experience. An employee so terminated, however, could go on voluntary furlough without pay or accept a lump sum based upon his rate of pay and term of service. § 505(f). An employee with more than three years of service who elected to resign or not to transfer to a vacancy requiring relocation was entitled to a separation allowance based upon his rate of pay, years of service, and age, subject to a maximum of $20,000. § 505(e). Most importantly, protected employees involuntarily "deprived of employment or adversely affected with respect to ... compensation" were entitled to an MDA. The Act authorized an MDA for all protected employees based on a single formula. According to the uniformly applicable MDA formula contained in original § 505(b), an employee's MDA was determined by computing the total compensation he received, including overtime, vacation allowances, and monthly compensation guarantees, during the twelve months preceding January 1, 1975. The employee's total time paid for during that period was also calculated. Dividing these annual totals by twelve produced the average monthly compensation and the average monthly time for which he was paid. If in any month an employee earned less in his current position than his average monthly compensation, he received an additional payment equal to the difference. If in any month an employee worked more hours in his current position than his average monthly time paid for, he received an additional payment equal to the hourly rate for his current position multiplied by the excess hours. The monthly displacement allowance was adjusted upward to reflect general wage increases in the industry. Through January 1979, there had been nine such increases for many Conrail employees.[6]
Although the Act made Conrail responsible for the payment of all Title V benefits, Congress provided for it to be reimbursed from the Regional Rail Transportation Protective Account. § 509. Congress appropriated $250 million to finance the benefits, with the expectation that that sum would cover all labor protection expenditures until the year 2021, when the last protected Conrail employee would reach retirement age. This was a monumental miscalculation. The well went dry in 1980.[7]
Congress had expected that most of the $250 million would be used for termination and separation allowances.[8] Instead, MDAs *1355 consumed most of the funds. On average, 13,000 employees claimed a typical MDA of $400 for a total of $5.2 million a month.[9] Moreover, most of the MDAs went to employees working full time for Conrail.[10]
There were several reasons for the high MDAs. One was the use of a single MDA formula for maintenance-of-way workers, operating employees, nonoperating employees, and noncontract employees, without regard to varying compensation methods differentiating these categories. Windfalls resulted from seasonal variations in work schedules, especially of maintenance-of-way workers. Because the statute did not require MDA payments to stop when combined earnings and MDA payments equalled twelve times the employee's 1974 average monthly compensation, many Conrail employees received total annual compensation in excess of their 1974 earnings. The use of 1974 as a base year resulted in windfalls because that year had an unusual amount of overtime and high earnings.[11]
Year by year it became increasingly apparent that Conrail could not survive unless drastic measures were taken to reduce the MDAs. Witnesses at a Senate hearing estimated that continuation of the original formula for calculating MDAs would require an additional appropriation of $736 million to $1.7 billion.[12]
Congress met this crisis by amending Title V in the Staggers Act. The objectives of the Staggers Act were to conserve scarce government resources and to eliminate inequities and windfalls, principally by using separate MDA formulae tailored to the differing compensation schemes of the major groups of railroad employees.[13] The Senate Report on S. 2530, the original bill containing the Title V amendments, contains the statement:
The purpose of ... this legislation is to improve the labor protection program that now provides benefits to the former employees of the Northeast and Midwest bankrupt railroads by reducing the opportunity for protected employees to receive excessive compensation guarantees ....
Senate Report at 1. Congress appropriated a modest $235 million to finance the Title V amendments.
The figures showing the effect of adoption of the Staggers Act are impressive. A comparison of the MDAs paid in September and October 1980, the last month under the old regime and the first of the new, shows that substantial savings immediately resulted:[14]

 September October
Maintenance-of-way employees $ 661,000 $ 121,000
Nonoperating employees $2,653,000 $1,108,000
Operating employees $3,423,000 $1,219,000
Noncontract employees $ 55,000 $ 48,000
 __________ __________
Total $6,792,000 $2,496,000

The partial claims, that is, the MDAs paid to employees actively working for Conrail, were as follows:[15]

*1356
 September October
Maintenance-of-way employes $ 489,000 $ 10,000
Nonoperating employees $1,626,000 $ 100,000
Operating employees $2,485,000 $ 648,000
Noncontract employees $ 9,000 $ 9,000
 __________ _________
Total $4,609,000 $ 767,000

III.

A. Effect of the Staggers Amendments

1. Maintenance-of-way employees
Maintenance-of-way employees are affected in two ways by § 501 of the Staggers Act. The first relates to the problem of seasonality. Maintenance-of-way employees are engaged in the repair of railroad facilities. Because they work outside, they work longer hours in the summer months, when weather conditions are favorable, than in the winter months. This difference in seasonal employment led to windfalls under the 1973 MDA calculation. Under the original RRR Act, MDA was calculated over a twelve month period. The allowance would be paid whenever the actual monthly compensation was less than the average monthly compensation. But there was no countervailing or offsetting adjustment in the formula for busy months during which a maintenance-of-way employee would earn more than his average monthly compensation.[16] A maintenance-of-way employee therefore could have an annual income in excess of his annual compensation guarantee (i. e., his average monthly compensation multiplied by twelve), yet nevertheless receive MDAs. Indeed, a maintenance-of-way employee who worked the same schedule in 1979 as in 1974, and thus suffered no displacement, could receive significant MDAs under the 1973 formula. This anomaly was noted by Congress and extensively illustrated in the Senate Report on S.2530.[17]
The Staggers Act overcomes the seasonality problem by annualizing the MDAs for maintenance-of-way workers. Under new § 505(b)(2), a maintenance-of-way employee is paid only 80 percent of the difference between his actual monthly straight-time earnings and his "average monthly compensation" as a monthly displacement allowance. The employee is paid for any shortfall between his compensation guarantee and his actual earnings through a yearend adjustment. Alternatively, if the sum of his monthly displacement allowances exceeds his annualized compensation guarantee, that amount is offset against future Title V benefits.
Second, the Staggers Act eliminates 1974 overtime compensation from the maintenance-of-way compensation base. The maintenance-of-way employee's total 1974 compensation is divided by the total time paid for during that period, yielding a straight-time hourly rate. This figure is multiplied by 174, the average number of work hours in a month, to produce "average monthly compensation". § 505(b)(2) (as amended).
The principal impact of the amendments has been on those maintenance-of-way employees who are still employed by Conrail. The number of claims by workers actively employed by Conrail fell from 1138 in September to 14 in October; the cost fell from $489,000 to $10,000. By contrast, the totally displaced employees were relatively unaffected. The number of their claims fell from 100 to 93; the cost fell from $172,000 to $111,000.

*1357 2. Nonoperating employees.
Nonoperating employees generally work straight-time schedules, with little seasonal variation.[18] In 1974, the base year for the original MDA computation, many nonoperating employees had worked an unusually large amount of overtime, in part as a result of hiring freezes instituted by predecessor railroads and in part because of unusually heavy clerical work undertaken in preparation for reorganization.[19] Thus, the 1974 earnings of many nonoperating employees were unrepresentative of their preconsolidation earnings.
The Staggers Act amendments eliminate that anomaly by guaranteeing each nonoperating employee only his straight-time rate for the position he held on September 1, 1979, or if he was not employed on that date, the rate for his prior position. § 505(b)(1)(A). He is guaranteed that hourly rate for the current full-time work schedule, § 505(b)(1)(C); if he fails to earn that amount, he receives an MDA.
The new formulation reduced MDAs payable to nonoperating employees by $1,545,000 between September and October 1980. This reduction again had its greatest impact on those employees who were receiving MDAs while still actively working for and being compensated by Conrail. The claims submitted by such employees fell from 4862 to 386; the costs fell from $1,626,000 to $100,000. The impact was slight on fully displaced employees who received no compensation from Conrail. Their claims fell from 597 to 577; costs fell from $1,027,000 to $1,008,000.

3. Operating employees.
Maintenance-of-way employees and nonoperating employees are paid primarily on an hourly wage basis. Unlike those classes of railroad employees, operating employees are paid on the basis of a complex system developed over many years, going back to the early 20th century and World War I, and incorporated into most collective bargaining agreements today.
The standard of payment for operating employees in road freight service is the "dual basis of pay" rule: 100 miles or less or 8 hours of work or less constitutes a day's work. Miles in excess of 100 miles are paid for at specified mileage rate. On runs of 100 miles or less, overtime begins after 8 hours. On runs of more than 100 miles, overtime begins when the time on duty exceeds the miles run divided by 12½. A full day's pay is earned for each run of 100 miles, regardless of the number of hours required to make the trip. Overmiles are paid on runs over 100 miles without regard to the time taken to make the trip.
Train and engine service employees also receive "constructive allowances" or "arbitraries" under most collective bargaining agreements. These are flat payments for specific activities, such as coupling air hoses connecting cars, or for particular hardships, such as enduring delays in the scheduled start or arrival time of a train, working through lunch, reporting for duty at other than the normal point, and switching cars at certain locations. In 1977, arbitraries amounted to 26.3 percent of the total compensation earned by Conrail road freight employees and 16.7 percent of the pay for yard and engine employees.[20]
Overtime pay and arbitraries for operating employees, unlike the other classes, was regarded by Congress in 1980 as a customary part of their compensation.[21] Congress therefore retained overtime pay, overmileage, and arbitraries in the 1974 base used to calculate MDAs for operating employees. Congress instead placed a "cap" or ceiling on their guaranteed compensation. Under new § 505(b)(3), the 1977 average compensation among Conrail employees in each Interstate Commerce Commission operating classification is calculated. This average is *1358 the maximum income guarantee, and any operating employee with a higher monthly displacement allowance guarantee has it reduced to reflect this average. Furthermore, because excessive MDAs for operating employees were in part due to seasonal changes in workload, new § 505(b)(3) contains an annual adjustment provision similar to that applicable to maintenance-of-way employees, whereby operating employees are initially paid only 75 percent of the difference between their monthly guarantee and actual compensation, with additional payments, or credits against future benefits, determined at year's end.
The Staggers Amendments substantially reduced the MDAs payable to operating employees, declining from $3,423,000 to $1,219,000 between September and October 1980. The number of partial claims fell from 4,017 in September to 1,793 in October 1980; payments fell from $2,485,000 to $648,000. As with the other categories of protected workers, the impact on fully displaced employees was less severe: claims fell from 466 to 408 in number; costs fell from $938,000 to $571,000 in amount.

4. Noncontract employees
Noncontract employees receive annual salaries, do not have problems related to seasonal activity, and do not receive overtime.[22] Accordingly, the Staggers Act does not amend the Title V MDA formula applicable to noncontract employees. These employees are much less adequately protected from the effects of displacement. The General Accounting Office found in its analysis of Title V that the method for calculating monthly displacement allowances discriminated against nonagreement employees in favor of unionized employees.[23] All three classes of unionized employees have their compensation guarantees upgraded by periodic negotiated pay increases, which qualified as "general wage increase[s]" under § 505(b)(1)(C) of the original RRR Act; operating and maintenance-of-way employees retain that advantage under the Staggers Act. §§ 505(b)(2), 505(b)(3) (as amended). Conrail's noncontract employees generally received "merit" increases, not considered "general wage increases" and therefore not reflected in their Title V benefit guarantees.[24] In retaining the original monthly displacement allowance formula for noncontract employees, Congress in effect ratified the de facto reduction in their benefits which had occurred during the inflationary four years of the program.

B. Analysis
The plaintiffs accept the fact that Congress was not constitutionally required to provide income protection for "adversely affected" Conrail employees. But, they contend, once Congress chose to provide it, the "equality value" in the fifth amendment required that Congress treat equally the three generic classes of agreement employees. They argue that the three classes are similarly situated as to need and statutorily-defined entitlement to supplemental income protection, and that there is no independent justification for using a different formula for operating employees from that used for the two other classes of employees. They concentrate their attack on the fact that the Staggers Act counts overtime and arbitraries in the base-year earnings of operating employees, but uses only straight-time earnings for non-operating and maintenance-of-way employees.
We disagree. Congress carefully considered the Staggers Act[25] and the relevant *1359 committee reports specifically found that the dissimilarities in the ways the four categories of employees are usually compensated made it appropriate to treat each class differently.[26] The legislative history reveals no strong effort on the part of railroad unions to oppose the Staggers Act as discriminatory. Indeed, the only testimony in opposition came from one of the plaintiffs in this case, Mr. Hinds, at a Senate hearing; the committee specifically considered and rejected much the same argument as he advances here in constitutional guise.[27]Cf. United States Railroad Retirement Board v. Fritz, 449 U.S. 166, 176, 101 S.Ct. 453, 461, 66 L.Ed.2d 368, 379 (1980).
First, we reject the plaintiffs' attempt to exclude noncontract employees from the analysis. The RRR Act is a whole and must be viewed as a whole. The fact that the Act, as amended, places noncontract employees in a less favorable position with respect to MDAs than the two allegedly aggrieved classes tends to negate their claim.
More significantly, we hold that the plaintiffs' attempt to confine the debate to the issue of overtime and arbitraries is not persuasive because it ignores the numerous other factors that go into MDA computations under the Staggers Act. For example, unlike maintenance-of-way and operating employees, a nonoperating employee's guaranteed rate is increased with a move to a higher-rated position, and he maintains that higher rate even if he later moves to a lower-rated position. § 505(b)(1)(B) and (D) (as amended). Maintenance-of-way and operating employees are subject to seasonal adjustment provisions; nonoperating employees are not. Neither maintenance-of-way nor nonoperating employees are subject to a cap provision similar to the one applicable to operating employees.
When the effect of these diverse restrictions is aggregated, the result is highly rational. The reductions in MDAs were spread among all four classes of employees, and the net effect of the amendments, as measured by the change in each class' share of the total MDAs paid before and after their enactment, is not large: the maintenance-of-way employees' share declined from 12.1 percent to 11.0 percent; the nonoperating employees' share declined from 45.8 percent to 35.9 percent; the operating employees' share increased from 39.4 percent to 51.2 percent; and the noncontract employees' share declined from 2.8 percent to 1.9 percent.[28] As noted above, within each class of employees the impact of the Staggers Act falls by far most heavily on those who least needed MDAsthat is, those employees who continue to work for Conrail.
Even on the plaintiffs' own terms, examining the inclusion of overtime and arbitraries in the base-year earnings of operating employees in isolation, the statute passes muster. The Senate Report on what became the Staggers Act justified this disparate treatment on the ground the wage structure of operating employees is based *1360 on "complex formulae . . . totally different from that of all other railroad employees" (a reference to the dual basis of pay rule), and that under those formulae "overtime and arbitrary payments should be considered a basic part of the wage structure for operating employees ...."[29] The plaintiffs offer two arguments to the contrary, but neither is sufficient.
First, they note that overtime and arbitraries are not part of the basic wage structure for operating employees in the sense that management is not obligated to provide either; that is, whether a given operating employee gets overtime or overmileage depends on whether his railroad schedules its operations so as to trigger his entitlement under the dual basis of pay rule, just as a given nonoperating employee will receive overtime if the railroad chooses to schedule him for more than an eight hour day. This proves nothing, because Congress could reasonably have assumed that operating employees generally receive a larger proportion of their compensation in the form of extras than do other classes of employees. Overtime and arbitraries amounted to nearly a third of the total compensation paid to Conrail's operating employees in each of the years 1976 through 1980, for example.[30] The plaintiffs made no showing that nonoperating or maintenance-of-way employees as a class systematically receive so large a proportion of their compensation in the form of overtime or other extras.[31]
Second, the plaintiffs note that the dual basis of pay rule applies to operating employees only while they are in road freight service, and offer an affidavit stating that at most 35 percent of Conrail's operating employees are engaged in road service at any one time. They therefore argue that Congress' decision to include all overtime and extras in the operating employees' MDA base was irrational because it was based on a misapprehension that their compensation was always based on the dual basis of pay rule. We think these facts prove precisely the opposite point. If every operating employee spends as much as 35 percent of his time on the road, and if overtime and arbitraries constitute a significant amount of their compensation while on the road, Congress is certainly entitled to take that fact into account when computing their expected pay. True, Congress could have chosen to take overtime and arbitraries into their MDA basis only if earned in road service. But in social welfare legislation, Congress is entitled to paint with an overbroad brush so long as each brushstroke is rationally motivated. Dandridge v. Williams, 397 U.S. 471, 485, 90 *1361 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). Because Congress could reasonably have assumed that operating employees earn a larger proportion of their compensation through extras, the distinction here is rational.
We have considered the plaintiffs' other arguments and find them to be without merit. The motion of the plaintiffs for a summary judgment is denied. The motions of the defendant and the intervenor for a summary judgment are granted.
NOTES
[1] With respect to Conrail, a protected employee is any person, other than a corporate officer, who was employed by one of Conrail's predecessor bankrupt railroads as of January 2, 1974 and who had not reached age 65. RRR Act, § 501(3).
[2] The plaintiffs' constitutional contentions are narrower in their brief than in their complaint in several respects. The brief claims unconstitutional discrimination only with respect to "supplemental income protection" or "partial claims"that is, MDAs due protected employees who continue to be employed by Conrail. Brief at 1-2. Second, the complaint alleges that Title V was enacted as a quid pro quo for contractual rights purportedly waived in the transactions that created Conrail. Because noncontract employees purportedly were treated more favorably than nonoperating and maintenance-of-way employees, who were protected by collective bargaining agreements, the complaint argues that Congress acted irrationally. But the plaintiffs withdraw that theory in their brief, at 1 n.1. Moreover, nothing in the legislative history shows that either in 1973 or in 1980 Congress intended Title V to compensate the bankrupts' employees for contractual rights forfeited when Conrail was created. On the contrary, it was clearly perceived as a social welfare program designed to secure a spell of labor peace for the fledgling Conrail and political support for the consolidation. See S.Rep.No. 96-784, 96th Cong., 2d Sess. 3 (1980) ("Senate Report"); 119 Cong.Rec. H 9739-40 (Nov. 8, 1973) (remarks of Rep. Skubitz); id. at H 9762 (remarks of Rep. Staggers). Finally, the complaint alleges that the classification adopted by the Staggers amendments was intended to discriminate against blacks, Hispanics, and women. Plaintiffs' counsel stated at oral argument that he would not pursue that allegation. Moreover, since the uncontested facts show that white males constitute 75 percent or more of each class of employees, that theory would fail in any case. See Personnel Administrator v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).
[3] MDAs are social welfare benefits, analogous to railroad retirement or social security benefits. There is no question of an uncompensated taking of property. Railroad Retirement Board v. Fritz, 449 U.S. 166, 172, 101 S.Ct. 453, 458, 66 L.Ed.2d 368, 375 (1980). The Supreme Court has consistently used minimal rationality as the appropriate standard for equal protection review in social welfare cases. See, e. g., id. (elimination of duplicative federal railroad retirement and social security benefits for certain classes of railroad workers); Califano v. Jobst, 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977) (federal statute terminating disabled dependent child's social security benefits upon marriage, except when married to a benefit recipient); Mathews v. DeCastro, 429 U.S. 181, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976) (federal statute denying social security surviving spouse benefits to divorced spouse under age 62); Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (federal duration-of-relationship requirement for receipt of surviving spouse and child social security benefits); Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972) (state program paying lower percentage of estimated need for aid for dependent children than for aid to other assistance classifications); Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971) (federal statute reducing social security benefits to reflect worker's compensation payments).
[4] Plaintiffs' Brief at 3.
[5] See In re Penn Central Transportation Co., 384 F.Supp. 895, 902-11 (Sp.Ct.R.R.R.A.1974); Regional Rail Reorganization Cases, 419 U.S. 102, 108-17, 95 S.Ct. 335, 341-45, 42 L.Ed.2d 320 (1974). See generally S.Rep.No. 93-601, 93d Cong., 1st Sess. (1973), reprinted in [1973] U.S.Code Cong. & Ad.News 3242.
[6] Comptroller General of the United States, Employee Protection Provisions of the Rail Act Need Change 3 (1979) (CED-80-16) ("Comptroller General's Report").
[7] H.R.Rep.No. 96-1035, 96th Cong., 2d Sess. 44-45 (1980), reprinted in [1980] U.S.Code Cong. & Ad.News 3978 ("House Report").
[8] USRANomination; Authorization; Conrail Plant Rationalization; and Employee Protection Program: Hearings on S. 2527 and 2530 Before the Subcomm. on Surface Transportation of the Senate Comm. on Commerce, Science and Transportation, 96th Cong., 2d Sess. 119 (1980) ("Senate Hearing") (statement of Herbert P. McLure, Associate Director, Community and Economic Development Division, GAO).
[9] Title V Authorization Under the Regional Rail Reorganization Act of 1973: Before the Subcomm. on Transportation and Commerce of the House Comm. on Interstate and Foreign Commerce, 96th Cong., 2nd Sess. 2 (1980) ("House Hearing") (statement of Ray James, Chief Counsel, Federal Railway Administration).
[10] Comptroller General's Report, supra note 6, at 8; House Hearing, supra note 9, at 8 (statement of John L. Sweeney, senior vice president, Conrail).
[11] Senate Report, supra note 2, at 5. One member of the clerks' union who earned $16,000 in one year working for Conrail was paid an additional $20,000 in MDAs. House Hearing, supra note 9, at 17 (statement of John L. Sweeney). More than 40% of the workers received combined earnings and MDAs in excess of their annual guarantees. Comptroller General's Report, supra note 6, at 31.
[12] House Hearing, supra note 9, at 1, 2 (Rep. Florio; statement of Ray James).
[13] H.R.Rep.No. 96-1430, 96th Cong., 2nd Sess. 131-32 (1980), reprinted in [1980] U.S.Code Cong. & Ad.News 3978, 4110 ("Conference Report").
[14] Conrail's Appendix I, Exhibits B, C, D, E (tentative figures).
[15] Id.
[16] There was another way in which the seasonality of maintenance-of-way work could lead to excessive compensation guarantees under the original formula. Section 505(b)(1) calculated average monthly compensation based on 12 months of earnings prior to January 1, 1975. However, this 12 month period did not necessarily correspond to calendar year 1974. Under the 50 percent rule, any month in which an employee worked less than 50 percent of his normal work schedule was eliminated from this base period, and an earlier month was substituted. Since some maintenance-of-way employees were inactive in the winter months, those months could be eliminated from their base periods. Effectively then, a maintenance-of-way employee's base period could include 12 busy months in 1974 and 1973, rather than reflecting his actual cyclical earnings pattern during 1974. This resulted in excessive benefits for maintenance-of-way employees. The Staggers Act eliminates the 50 percent rule for maintenance-of-way employees. § 505(b)(2) (as amended).
[17] Senate Report, supra note 2, at 7-8.
[18] Id. at 6.
[19] House Hearings, supra note 9, at 19 (statement of John L. Sweeney, senior vice president, Conrail).
[20] Comptroller General of the United States, Conrail's Attempt to Control Labor Costs and Improve Its Labor Productivity 13-19 (1980).
[21] Senate Report, supra note 2, at 6, 8-9.
[22] Conference Report, supra note 13, at 130; Senate Report, supra note 2, at 24.
[23] Comptroller General's Report, supra note 6, at 36-39.
[24] House Hearings, supra note 9, at 13 (statement of John L. Sweeney, senior vice president, Conrail).
[25] The House of Representatives conducted public hearings on the need for modifications in Title V. House Hearing, supra note 9. Two bills which would amend Title V were introduced in the House of Representatives. H.R. 7110, 96th Cong., 2d Sess. (1980); H.R. 7235, 96th Cong., 2d Sess. (1980). H.R. 7235 was reported from committee with extensive comment on the Title V amendments, House Report, supra note 7, at 44-50, and enacted by the House on September 9, 1980. 126 Cong.Rec. H 8608 (Sept. 9, 1980).

The Senate also conducted public hearings on the issue of Title V modifications. Senate Hearing, supra note 8. A separate bill dealing primarily with Title V amendments, S. 2530, 96th Cong., 2d Sess. (1980), was reported from committee with an extensive analysis, Senate Report, supra note 2, and enacted on June 28, 1980. 126 Cong.Rec. S 8824 (June 28, 1980).
H.R. 7235 dealt with railroad deregulation as well as Title V modifications. In contrast, the Senate had enacted S. 2530, the bill dealing with Title V, and S. 1946, 96th Cong., 2d Sess. (1980), a separate piece of railroad deregulation legislation. The three bills went to conference, and a combined deregulation and Title V modification bill, the Staggers Rail Act, was reported. Conference Report, supra note 13. The Staggers Rail Act was enacted by both chambers of Congress on September 30, 1980. 126 Cong.Rec. S 14012, H 10087 (Sept. 30, 1980).
[26] Senate Report, supra note 2, at 6-9; House Report, supra note 7, at 74-75; Conference Report, supra note 13, at 129-32.
[27] Senate Hearings, supra note 8, at 100; Senate Report, supra note 2, at 6-7.
[28] Conrail's Appendix I, Exhibit F.
[29] Senate Report, supra note 2, at 8-9.
[30] Conrail's wage statistics reports to the ICC for those years pertaining to train and engine service employees show:

 Year Straight Time Paid Overtime Paid Arbitraries Paid Total Percent
 1976 320,894 57,412 93,549 471,855 32.0%
 1977 435,781 80,405 125,676 641,862 32.1%
 1978 463,704 90,838 129,695 684,037 32.2%
 1979 478,755 93,974 142,936 715,665 33.1%
 1980 483,957 70,016 134,708 688,681 29.7%

All figures are in thousands of dollars. The figures for 1976 are for April through December. "Arbitraries Paid" includes all constructive allowances, vacations and holidays. "Percent" is "Overtime Paid" plus "Arbitraries Paid" as a percentage of "Total". See Conrail's Appendix VI.
[31] The plaintiffs presented several affidavits by employees other than operating employees who work overtime frequently, but this is far from sufficient to show that such employees as a class receive as much of their total compensation in the form of overtime and extras as do operating employees.