638 F.Supp. 350 (1986)
CONSOLIDATED RAIL CORPORATION and National Railroad Passenger Corporation, Plaintiffs,
v.
METRO-NORTH COMMUTER RAILROAD COMPANY, Metropolitan Transportation Authority, and Connecticut Department of Transportation, Defendants,
v.
UNITED STATES of America, Counterclaim Defendant.
Civ. A. No. 83-14.
Special Court, Regional Rail Reorganization Act.
June 18, 1986.
*351 Ralph G. Wellington, Margaret S. Woodruff, Philadelphia, Pa. (Schnader, Harrison, Segal & Lewis, Bruce B. Wilson, Donald A. Brinkworth, Philadelphia, Pa., of counsel), for plaintiff, Consolidated Rail Corp.
Robert M. Lustberg, Walter E. Zullig, Jr., (Steven Polan, Gen. Counsel, Metropolitan Transp. Authority, New York City, of counsel), for defendants, Metropolitan Transp. Authority and Metro-North Commuter R. Co.
Robert R. Prince, Mark S. Shipman, Schatz and Schatz, Ribicoff and Kotkin, Stamford, Conn., for defendant, Connecticut Dept. of Transp.
Richard K. Willard, Acting Asst. Atty. Gen., Michael F. Hertz, Alan E. Kleinburd, Attys., Civ. Div., U.S. Dept. of Justice, Washington, D.C., for counterclaim defendant, U.S.
*352 Before WISDOM, Presiding Judge, and THOMSEN and GASCH, Judges.
WISDOM, Presiding Judge:
This case arises out of § 1136 of the Northeast Rail Service Act of 1981 (NERSA), Pub.L. No. 97-35, 95 Stat. 643, codified at 45 U.S.C. 744a. Our jurisdiction is grounded on § 1152(a)(4) of NERSA. Section 1136 relieved the Consolidated Rail Corporation (Conrail) of its obligation to operate commuter service under §§ 303(b)(2) and 304(e) of the Regional Rail Reorganization Act of 1973 (Rail Act), Pub.L. No. 93-236, 87 Stat. 985, codified at 45 U.S.C. 743(b)(2), 744(e). On January 1, 1983, Conrail ceased operating commuter trains on the New Haven and Harlem-Hudson Lines. These trains had been operated by the Penn Central Railroad under long-term contracts with the Metropolitan Transportation Authority (MTA) and the Connecticut Department of Transportation (CDOT).
In an earlier phase of this litigation, we held that neither Conrail nor the United States must pay for Conrail's exercise of trackage rights reserved by Penn Central in its commuter service agreements with MTA and CDOT, even though Conrail no longer discharges Penn Central's obligations under the agreements. Consolidated Rail Corp. v. Metro-North Commuter Railroad Co., Sp.Ct.R.R.R.A.1984, 598 F.Supp. 1571. MTA and CDOT now assert that § 1136 effected a taking of their property without just compensation and that the statute violated the Fifth Amendment by depriving them of their property without due process of law. We hold that § 1136 does not violate the Fifth Amendment.

I.
From 1970 to 1976, the Penn Central Railroad operated commuter trains on the New Haven Line under agreements with MTA and CDOT. From 1972 to 1976, Penn Central operated commuter trains on the Harlem-Hudson Line under similar agreements with MTA.[1] Under the terms of the agreements, MTA and CDOT purchased or leased railroad properties from Woodlawn Junction to New Haven on the New Haven Line, and from Grand Central Terminal to Dover and Poughkeepsie on the Harlem-Hudson Line. Penn Central agreed to operate the commuter services for five-year periods, renewable for up to 60 years at the option of MTA and CDOT. MTA and CDOT agreed to reimburse Penn Central for all losses incurred by the commuter services.
The Rail Act of 1973 created Conrail and directed it to take over some commuter services previously operated by Penn Central. From April 1, 1976 to January 1, 1983, Conrail operated the New Haven and Harlem-Hudson passenger trains according to the terms of the Penn Central agreements.
In 1981 Congress enacted NERSA. Section 1136 of that Act provides: "Notwithstanding any other provision of law or contract, Conrail shall be relieved of any legal obligation to operate commuter service on January 1, 1983". 45 U.S.C. 744a. Section 1137 of NERSA created Amtrak Commuter and authorized that wholly-owned subsidiary of Amtrak to take over commuter services if transportation authorities agreed to pay the difference between the revenues from the service and the "avoidable costs" of operation.
MTA and CDOT elected not to accept the service of Amtrak Commuter. Instead, MTA organized a wholly-owned subsidiary, Metro-North Commuter Railroad Company (Metro-North), which took over operation of the New Haven and Harlem-Hudson commuter services on January 1, 1983. MTA and CDOT contend that they have been damaged by § 1136. They assert that economies of scale kept Conrail's operating costs below those of Metro-North, and that MTA and CDOT incurred large costs to *353 organize a new operating company.[2] To decide the issue of liability, we assume, without deciding, that MTA and CDOT have been damaged by the decision of Congress to extinguish the Penn Central agreements.

II.
The parties raise two preliminary issues. The United States argues that Conrail was not bound by the Penn Central's contracts with MTA and CDOT. MTA and CDOT argue that Conrail is an agency of the United States for purposes of the Fifth Amendment.

A.
The government contends that, because Conrail was never obligated to discharge Penn Central's obligations under the agreements with MTA and CDOT, Conrail's failure to discharge those obligations breached no contractual right of MTA or CDOT. In the government's view, Congress simply directed Conrail to take over operation of the New Haven and Harlem-Hudson lines under § 304(e) of the Rail Act, 45 U.S.C. 744(e). That section required Conrail to continue existing passenger service if local transportation authorities agreed to subsidize the losses in full.
MTA and CDOT contend that Congress directed Conrail to assume Penn Central's contractual obligations under the service contracts in § 303(b)(2) of the Rail Act, 45 U.S.C. 743(b)(2). That section provides, in part:
"All rail properties conveyed to the Corporation ... shall be conveyed free and clear of any liens or encumbrances, but subject to such leases and agreements as shall have previously burdened such properties or bound the owner or operator thereof in pursuance of an arrangement with any State, or local or regional transportation authority under which financial support from such State, or local or regional transportation authority was being provided at the time of enactment of this Act for the continuance of rail passenger service ...".
The government argues that § 303(b)(2) does not apply to the agreements with MTA and CDOT because Penn Central conveyed to Conrail no rail properties burdened by those agreements. To be sure, MTA and CDOT owned or leased the rail properties used to provide the New Haven and Harlem-Hudson commuter services. Penn Central did, however, convey to Conrail valuable freight trackage rights over the New Haven and Harlem-Hudson lines.
We considered the applicability of § 303(b)(2) to the Penn Central agreements in Penn Central Corp. v. Consolidated Rail Corp., Sp.Ct.R.R.R.A.1985, 611 F.Supp. 285. There we concluded that "Congress meant [in § 303(b)(2)] to preserve the West End [i.e., the New Haven] and Harlem-Hudson agreements undisturbed except that Conrail would replace Penn Central as operator of the commuter service". Id. at 290-91. We were persuaded by the language of the Final System Plan, which notes that the Rail Act "requires Conrail to honor the MTA/CDOT contracts", and directs that Conrail "will assume these contracts". 1 FSP 45. We noted that in these circumstances the language of the Final System Plan is decisive. 611 F.Supp. at 290. Finally, we concluded that Conrail's actions showed that it regarded the bundle of contracts with MTA and CDOT as having been "conveyed". Id. at 291.
In Consolidated Rail Corp. v. Metro-North Commuter Railroad Co., we decided that Conrail provided the New Haven and Harlem-Hudson commuter services "in accordance with § 303(b)(2) of the Rail Act and the provisions of 1 FSP 45". 598 F.Supp. at 1576. We noted that, during *354 hearings on the 1973 legislation, the Chairman of MTA protested to the Senate Committee on Commerce that the Rail Act might not preserve MTA's rights "under the several leases and agreements embodying our financial support arrangements with Penn Central". Id. at n. 2. Senator Javits offered § 303(b)(2) as a floor amendment in response to MTA's protest. Id.
We conclude that the service agreements were governed by § 303(b)(2), and so bound Conrail.

B.
If Conrail is an agency of the government, as MTA and CDOT contend it is, then Conrail's obligations under the service agreements are obligations of the United States.
Congress lacks power to reduce government expenditures by abrogating contractual obligations of the United States unless it is exercising a "paramount power". Lynch v. United States, 1934, 292 U.S. 571, 579-80, 54 S.Ct. 840, 843-44, 78 L.Ed. 1434. In Lynch, the Court held that an attempt by Congress to reduce federal expenditures by cancelling life insurance policies issued to World War I veterans by the government was unconstitutional.
Congress has declared that Conrail is a private, for-profit corporation which "shall not be an agency or instrumentality of the Federal Government". Rail Act § 301(b), 45 U.S.C. 741(b). The Supreme Court recently construed language similar to § 301(b) and concluded that Amtrak is not part of the government. National Railroad Passenger Corp. v. Atchison, Topeka and Santa Fe Railway Co., 1985, 470 U.S. 451, 105 S.Ct. 1441, 1446, 1452, 84 L.Ed.2d 432 (the Amtrak case). We reach the same conclusion as to Conrail. Indeed, in one important respect Amtrak is more closely identified with the government than is Conrail. Congress permitted stockholders to elect only two of Amtrak's nine directors. Rail Passenger Service Act § 303. In contrast, Congress provided that eleven of the thirteen members of Conrail's board were to be elected by the stockholders. Rail Act § 301(d).
That Congress has power to create private corporations in pursuit of public goals has been settled at least since the Supreme Court upheld the establishment of a Bank of the United States in M'Culloch v. Maryland, 1819, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579. The mere declaration by Congress that Conrail is a private corporation does not, however, foreclose judicial consideration of the question. The result in Lynch, for example, would not have been different if Congress had assigned the government's obligations to a government-owned corporation denominated "private" by an act of Congress.
We decline to equate MTA and CDOT with the insurance beneficiaries in Lynch. The Lynch beneficiaries began with contract rights owed by the United States. MTA and CDOT began with contract rights owed by Penn Central, a bankrupt private corporation. Section 303(b)(2) substituted another private corporation, Conrail, for Penn Central. MTA and CDOT, unlike the insurance beneficiaries in Lynch, argue that they are entitled to more than they bargained for.
MTA and CDOT argue that government ownership and direction transformed obligations of Conrail into obligations of the United States. They contend that "[i]n the real world, in 1981, Conrail was as much an instrumentality of the United States, a part of the Government, as was its `owner', the Department of Transportation". MTA and CDOT assert that when NERSA was enacted the United States was Conrail's sole shareholder, appointed all its directors, and was its sole creditor except for the owners of some leased equipment.[3]
*355 Congress did not intend this state of affairs when it passed the Rail Act. On the contrary, the Act contemplated that the shareholders and creditors of the bankrupt railroads, not the government, would own Conrail. See Rail Act § 206(d)(1), 45 U.S.C. 716(d)(1). This Court then held that those shareholders and creditors had a Tucker Act claim for the difference between the value of their Conrail securities and the value of the railroad assets conveyed to Conrail. In re Penn Central Transportation Co., Sp.Ct.R.R.R.A.1974, 384 F.Supp. 895. The Supreme Court adopted our reasoning in the Rail Act Cases, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320. Congress avoided Tucker Act suits by authorizing "certificates of value" under § 610(b) of the Railroad Revitalization and Regulatory Reform Act of 1976. The United States promised to redeem the certificates before December 31, 1987 to make up the difference in value between Conrail securities and the assets conveyed to Conrail. Rail Act § 306(c). It so happened, however, that certificates of value and Conrail securities both proved unpopular with shareholders and creditors of the bankrupt railroads. The government, therefore, settled litigation over the value of assets conveyed to Conrail by making cash payments from the Treasury. In these circumstances, we find no reason to depart from the general rule that private corporations created by Congress are legally distinct from the government.
We have found no authority for the proposition that Conrail is an agency of the government, and considerable authority to the contrary. The Supreme Court has concluded that Conrail is "basically a private, not a governmental enterprise". Regional Rail Reorganization Act Cases, 1974, 419 U.S. 102, 152, 95 S.Ct. 335, 363, 42 L.Ed.2d 320. This Court has stated that Conrail is a private corporation. Hinds v. Consolidated Rail Corp., Sp.Ct.R.R.R.A.1981, 518 F.Supp. 1350, 1354, cert. denied, 1982, 454 U.S. 1145, 102 S.Ct. 1007, 71 L.Ed.2d 298. Conrail has been permitted to sue the United States. See, e.g., Consolidated Rail Corp. v. United States, 3 Cir.1980, 619 F.2d 988. The Court of Claims has dismissed a suit against the United States for breach of contract by Conrail. See T.O. F.C. v. United States, 1982, 231 Ct.Cl. 182, 683 F.2d 389, 393.

III.
We must decide whether § 1136 took property from MTA and CDOT without just compensation or deprived MTA and CDOT of property without due process of law.[4] Although these questions are not entirely distinct, we consider them separately.

A.
"Valid contracts are property, whether the obligor be a private individual ... or the United States." Lynch v. United States, 292 U.S. at 579, 54 S.Ct. at 843. It *356 is well-established, however, that Congress "has greater freedom to deal with private contractual rights than with obligations of the Federal Government". United Transportation Union v. Consolidated Rail Corp., Sp.Ct.R.R.R.A.1982, 535 F.Supp. 697, 706, cert. denied, 457 U.S. 1133, 102 S.Ct. 2960, 73 L.Ed.2d 1350. In UTU v. Conrail, we held that § 1143(a) of NERSA, which extinguished contract rights of railroad employees and subjected some employees to termination, did not effect a taking.
The principle governing our decision in UTU v. Conrail has long been affirmed by the Supreme Court. The Court stated the principle in Norman v. Baltimore & Ohio Railroad, 1935, 294 U.S. 240, 307-08, 55 S.Ct. 407, 416, 79 L.Ed. 885:
Contracts, however express, cannot fetter the constitutional authority of the Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them.
The Supreme Court recently quoted this passage in Connolly v. Pension Benefit Guaranty Corp., 1986, ___ U.S. ___, 106 S.Ct. 1018, 89 L.Ed.2d 166. Connolly holds that amendments to the Employee Retirement Income Security Act requiring employers to pay contributions to pension funds in excess of those required under collective bargaining agreements do not effect a taking.
The patina of old cases does not affect their quality. In Louisville & Nashville Railroad Co. v. Mottley, 1911, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297, the Mottleys settled a personal injury case against the railroad in return for passes entitling them to free travel on the railroad for the rest of their lives. A subsequently-enacted federal statute forbade free passes. The Court concluded that an "[a]greement between the railroad company and the Mottleys must necessarily be regarded as having been made subject to the possibility that, at some future time, Congress might so exert its power in regulating interstate commerce as to render that agreement unenforceable or to impair its value". 219 U.S. at 482, 31 S.Ct. at 270. If another rule were adopted, parties could limit federal powers by private agreement. Id. at 485-86, 31 S.Ct. at 271.[5] The Court employed similar reasoning to reach the conclusion that the government need not compensate the owner of a contract to purchase steel at a below-market price when the government requisitions the supplier's output. Omnia Commercial Co. v. United States, 1923, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773.
The Supreme Court "has been unable to develop a `set formula' for determining when `justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons". Penn Central Transportation Co. v. New York City, 1978, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631. The result "depends largely `upon the particular circumstances'" of the case. Id., quoting United States v. Central Eureka Mining Co., 1958, 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228. The Court has, however, identified three factors of "particular significance": 1) "the character of the governmental action"; 2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and 3) "the economic impact of the regulation on the claimant". Connolly v. Pension Benefit Guaranty Corp., 106 S.Ct. at 1026, *357 quoting Penn Central Transportation Co., 438 U.S. at 124, 98 S.Ct. at 2659.
As to the first factor, MTA and CDOT do not suggest that § 1136 can be characterized as a physical invasion. The government has not permanently appropriated assets of MTA and CDOT for its own use. In effect, § 1136 shifted a cost that had been borne by citizens of the United States to citizens of New York and Connecticut, and to passengers on the New Haven and Harlem-Hudson lines. When a statute interferes with property rights in order to "adjust the benefits and burdens of economic life to promote the common good", the statute is less likely to constitute a taking. Penn Central Transportation Co., 438 U.S. at 124, 98 S.Ct. at 2659.
As to the second factor, we conclude that § 1136 interfered with no reasonable investment-backed expectations of MTA or CDOT. Perhaps no industry has a longer history of pervasive federal regulation than the railroad industry. Amtrak, 105 S.Ct. at 1453. Perhaps no sector of the railroad industry has been more heavily regulated than the passenger service sector. For many years Congress, through the Interstate Commerce Commission, has required railroads to continue unprofitable passenger service and to undertake new service. See 49 U.S.C. §§ 10908-09. Section 404 of the Rail Passenger Service Act prohibited any railroad that did not transfer its responsibilities to Amtrak from discontinuing any intercity passenger train service for five years. 45 U.S.C. § 564. From the beginning Congress announced its intention to return Conrail to the private sector. Rail Act § 401. By 1981, all parties agreed that Conrail could not be returned to the private sector as long as it continued to operate unprofitable commuter services. See infra note 8. "Those who do business in the regulated field cannot object if the regulated scheme is buttressed by subsequent amendments to achieve the legislative end". Federal Housing Administration v. Darlington, Inc., 1958, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132.
As to the third factor, the government concedes that § 1136 completely extinguishes the service contracts. Other sections of NERSA, however, lessen the economic impact of § 1136 on MTA and CDOT. Section 1137 provided for the creation of a commuter division of Amtrak to take over the commuter operations from Conrail. The Act also provides MTA and CDOT with $59 million to cover "transitional expenses".
"The purpose of forbidding uncompensated takings of private property for public use is `to bar the Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Connolly, 106 S.Ct. at 1027, quoting Armstrong v. United States, 1960, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554. We are not persuaded that it is fair or just to require citizens of the United States to bear the costs imposed by the service agreements.

B.
MTA and CDOT further argue that § 1136 deprived them of property without due process of law. The Supreme Court has set out the standards we are to apply to the due process claim in the Amtrak decision, 105 S.Ct. at 1455.
Amtrak instructs that, if the impairment of contractual obligations is "substantial", the court must examine the legislation. "When the contract is a private one, and when the impairing statute is a federal one, this next inquiry is especially limited, and the judicial scrutiny is quite minimal.... The party asserting a Fifth Amendment due process violation must overcome a presumption of constitutionality and `"establish that the legislature has acted in an arbitrary and irrational way"'", id., quoting, Usery v. Turner Elkhorn Mining Co., 1976, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752.
The United States does not dispute the fact that § 1136 substantially impaired *358 private contractual obligations.[6] The government does argue, and we agree, that divesting Conrail of its commuter operations was a rational step toward ending federal subsidization of commuter rail service and returning Conrail to the private sector.[7] Even though MTA and CDOT were obliged to make up the operating losses of the commuter services, the method of calculating operating losses embodied in the service agreements may have understated actual operating losses. Congress, moreover, reasonably concluded that Conrail's freight operations, the only part of Conrail's business that might become profitable in the foreseeable future, would be more attractive to prospective purchasers if those operations were not bound up with large unprofitable commuter operations that inevitably would drain managerial resources and decrease overall profitability.[8]
The Supreme Court has said that it is less inclined to accept a Congressional determination of necessity or rationality if the legislature's self-interest is apparent. Perry v. United States, 1935, 294 U.S. 330, 350-51, 55 S.Ct. 432, 434-35, 79 L.Ed. 912. MTA and CDOT argue that this principle requires closer scrutiny of § 1136 even though Conrail is a private corporation, because the United States stood to gain from extinguishing the passenger service contracts. The Court recently said, however, that "where the Government is not a party to the contract at issue, these concerns [of legislative self-interest] are not implicated, and there is no reason to argue for a heightened standard of review". Amtrak, 105 S.Ct. at 1455 n. 24.
If Conrail had not taken over the commuter operations, MTA and CDOT assert that they would have been entitled to sue Penn Central for breach of contract. MTA and CDOT could not sue Penn Central until Conrail stopped operating the commuter service, because they could not show damages. By the time Congress passed § 1136, however, it was too late to pursue a successful bankruptcy claim against Penn Central.[9]
*359 This line of argument adds nothing to the due process claim. Our analysis does not depend upon whether MTA and CDOT were deprived of performance by a solvent operator or deprived of a claim in bankruptcy against an insolvent operator. A decision by Congress to extinguish the service contracts would not have been arbitrary or irrational in either case. A fortiori, it was not arbitrary or irrational for Congress to extinguish the service contracts after more than six years' experience demonstrated that Conrail could not be sold until it discontinued passenger operations. Moreover, MTA and CDOT chose to ask Congress to substitute Conrail for Penn Central rather than to pursue their claim in bankruptcy against Penn Central. Section 303(b)(2) was a floor amendment introduced by the Senior Senator from New York in response to testimony by MTA Chairman William J. Ronan. See Conrail v. Metro-North, 598 F.Supp. at 1576 n. 2. No doubt it could not have passed without the support of the transportation authorities. The fact remains that MTA and CDOT chose § 303(b)(2) over whatever remedy they might have had in the bankruptcy court, seriously undermining their claim to deprivation of due process of law.

C.
Finally, MTA and CDOT argue that we should apply, not the test of Amtrak but that of Allied Structural Steel Co. v. Spannaus, 1978, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727. Spannaus decided that the Minnesota legislature could not constitutionally compel corporations to fund unvested pension obligations when the corporations left the state or terminated their pension plans. The Court based its decision on findings that the statute "nullifies express terms of [private] contractual obligations and imposes a completely unexpected liability in potentially disabling amounts" without a showing that "this severe disruption of contractual expectations was necessary to meet an important general social problem". 438 U.S. at 247-49, 98 S.Ct. at 2723-25. The statute, moreover, had "an extremely narrow focus", and "was not even purportedly enacted to deal with a broad, generalized economic or social problem". Id. at 249-51, 98 S.Ct. at 2724-25. MTA and CDOT argue that this case meets all the criteria of Spannaus. We do not agree that the liability is so large as to be "potentially disabling", or that it was completely unexpected in the light of the extensive federal regulation of the railroad industry. We do not agree, moreover, that the Spannaus test governs this case.
Spannaus was decided under the Contract Clause, which by its terms binds only the states and not the federal government. MTA and CDOT argue, nevertheless, that the same "ground rules" should apply both to cases brought against the states under the Contract Clause and to cases brought against the federal government under the Due Process Clause of the Fifth Amendment.
The Supreme Court has rejected the proposition that Fifth Amendment Due Process imposes requirements as stringent as those of the Contract Clause. The Court has said: "We have never held that the principles embodied in the Fifth Amendment's Due Process Clause are coextensive with the prohibitions existing against state impairments of pre-existing contracts. Indeed, to the extent that recent decisions of the Court have addressed the issue, we have contrasted the limitations imposed on States by the Contract Clause with the less searching standards imposed on economic legislation by the Due *360 Process Clauses." Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 1984, 467 U.S. 717, 104 S.Ct. 2709, 2720, 81 L.Ed.2d 601. The Court reiterated this position in the Amtrak Case, 105 S.Ct. at 1455 n. 25. Even the dissenters in Spannaus recognized that the majority's approach allows the federal government greater leeway under the Due Process Clause than it grants states under the Contract Clause. 438 U.S. at 261-64, 98 S.Ct. at 2730-32. In the light of these pronouncements of the Supreme Court, we adhere to the distinction between the two clauses.

CONCLUSION
We hold that § 1136 violates no Fifth Amendment right of MTA or CDOT. Over the past decade, Congress has provided large subsidies for commuter rail service in New York and Connecticut. MTA has received annual federal subsidies of about $24 million. NERSA granted MTA and CDOT an additional $59 million for "transitional expenses" due to the start-up of Metro-North. New York and Connecticut surely are better off than they would have been if the federal government had left them to pursue a claim against the Penn Central's trustees in bankruptcy.
The motion of MTA and CDOT for summary judgment is DENIED.
The motion of the United States to dismiss the amended counterclaims of MTA and CDOT is GRANTED.
NOTES
[1] We have described these agreements in Consolidated Rail Corp. v. Metro-North Commuter R. Co., 598 F.Supp. at 1574-76.
[2] MTA and CDOT also assert that they were deprived of a credit, based on the income from Penn Central's non-railroad properties in Manhattan, worth about $1.8 million per year. They further assert that they were deprived of the benefits of a fixed management fee in lieu of a return on investment, exclusion of depreciation from operating deficit computations, favorable allocation of common costs, and payment of deficits quarterly, in arrears.
[3] As a matter of fact Conrail's employees, though a trust, own 15 percent of the stock. Congress provided for the creation of an employee stock ownership plan, or ESOP, in § 3 of the United States Railway Association Amendments Act of 1978, Pub.L. No. 95-565, 92 Stat. 2397 (Nov. 1, 1978). The ESOP was established after Congress passed an amendment to the Rail Act exempting those associated with the ESOP from any fiduciary duty to the ESOP beneficiaries. Pub.L. No. 96-254, § 118, 94 Stat. 399, 406 (May 30, 1980). The ESOP beneficiaries are not represented by an independent trustee. See Hoover v. Dole, Sp.Ct.R.R.R.A.1985, 613 F.Supp. 374, 379-80, cert. denied, ___ U.S. ___, 106 S.Ct. 228, 88 L.Ed.2d 228.
[4] MTA and CDOT concede that Congress had power under the Commerce Clause to extinguish the service contracts. The absence of any provision in § 1136 for recourse against the government is not an expression of Congressional intent to deny such recourse. Ruckelshaus v. Monsanto Co., 1984, 467 U.S. 986, 1017, 104 S.Ct. 2862, 2881, 81 L.Ed.2d 815. We have no doubt that Congress would have preferred payment of just compensation to invalidation of § 1136. In a similar situation, we held that the Fifth Amendment was satisfied by an implied Tucker Act remedy. In re Penn Central Transp. Co., Sp.Ct.R.R.R.A.1974, 384 F.Supp. 895.

Similarly, we have concluded that MTA and CDOT cannot recover against Conrail for breach of the service agreements because Congress did not intend this result. If any party is liable to MTA and CDOT for Conrail's failure to perform under the service agreements, it is the United States. See Consolidated Rail Corp. v. Metro-North Commuter R. Co., 598 F.Supp. at 1583.
[5] The Mottleys sought specific performance of the contract. The opinion nowhere indicates that the Court would have awarded damages against either the United States or the railroad. The Court also mentions the possibility that the Mottleys were left with a state law remedy. 219 U.S. at 486, 31 S.Ct. at 271. The opinion does not suggest how the statute of limitations was to be avoided, however. Nor does the Court state that the result would have been different if the Mottleys clearly lacked a state law remedy.
[6] Section 1137 of NERSA provided for the creation of a commuter division of Amtrak to take over commuter operations from Conrail. MTA and CDOT assert, and the government does not seriously contest, that the terms of § 1137 were less favorable to MTA and CDOT than were the terms of the service agreements. We assume, without deciding, that the substitution of § 1137 of NERSA for § 303(b)(2) of the Rail Act substantially impaired MTA's and CDOT's rights under the service agreements.
[7] MTA and CDOT suggest that Congress has not pursued a sale of Conrail and that its failure to do so suggests that Congress never intended to sell Conrail. On the contrary, the Senate recently approved a sale to Norfolk Southern for $1.2 billion following an eight-day debate. Wall St.J., Feb. 11, 1986, at 4. col. 3. In choosing between rival bidders, Congress must weigh various factors including the importance of returning Conrail's properties to the private sector, the value of the bid, the value of foregone tax benefits, the effect of a merger on competition, and the future of Conrail's employees. In view of these difficulties, we are unwilling to conclude that Congress has unreasonably delayed a sale.
[8] There is no doubt that NERSA was intended to increase the probability that Conrail would be sold. Section 1142 of NERSA directs the Secretary to attempt to sell Conrail once the Board of Directors of the United States Railway Association determines that Conrail will become profitable. There is also no question that "the primary purpose of NERSA ... was to reduce federal subsidization". RLEA v. SEPTA, Sp.Ct. R.R.R.A., 1982, 534 F.Supp. 832, 841, cert. denied, 456 U.S. 990, 102 S.Ct. 2271, 73 L.Ed.2d 1285. NERSA was part of the Omnibus Budget Reconciliation Act of 1981, a budget-cutting act. The House Committee on Energy and Commerce summarized this dual purpose:

All three reports [from Conrail, USRA, and DOT] agreed that changes were needed if Conrail were to become profitable, or if it were to be sold. The reports agreed ... [that] the commuter service obligations are a drain on Conrail's management attention and finances, and would effectively discourage any potential purchasers which had to assume the obligation under the present conditions.
H.R.Rep. No. 97-153, 97th Cong., 1st Sess., at 4.
[9] At oral argument, the government suggested that MTA and CDOT could have filed an administrative claim in the Penn Central bankruptcy court during the interval between the enactment of § 1136 in 1981 and its effective date, January 1, 1983. Although the question is not free from doubt, we decline to accept the government's view. The bankruptcy court, in its discussion of railroad-related executory contracts disaffirmed by the Penn Central trustees, said:

[W]ith respect to the contracts assumed by Conrail, the Trustees' disaffirmance serves a rather limited procedural purpose, because no damages flow from disaffirmance. Disaffirmance in this context is merely a procedural convention for putting the other party on notice that any claim arising under the contractual relationship will have to be asserted in the reorganization proceedings.
In re Penn Central Transp. Co., E.D.Pa.1978, 458 F.Supp. 1346, 1350. The bankruptcy court thus apparently concluded that claims arising under executory contracts assumed by Conrail could not be brought against the Trustees or the reorganized company after the Trustees were permitted to disaffirm the contracts on August 10, 1978.