575 F.Supp. 1554 (1983)
RAILWAY LABOR EXECUTIVES' ASSOCIATION, Plaintiff,
v.
UNITED STATES of America and Consolidated Rail Corporation, Defendants.
Civ. A. No. 82-11.
Special Court, Regional Rail Reorganization Act.
December 19, 1983.
Certiorari Denied March 19, 1984.
*1555 Norton N. Newborn, Norton N. Newborn, CO., L.P.A., Cleveland, Ohio, for plaintiff Railway Labor Executives' Ass'n.
Harry A. Rissetto, Morgan, Lewis & Bockius, Washington, D.C., and Dennis Alan Arouca, Consolidated Rail Corporation, Philadelphia, Pa., for defendant Consolidated Rail Corp.
Robert S. Lavet, C. Max Vassanelli, U.S. Dept. of Justice, Civil Div., Washington, D.C., for defendant United States of America.
Before GASCH, Presiding Judge, and BRYANT and WEINER, JJ.
Certiorari Denied March 19, 1984. See 104 S.Ct. 1596.
GASCH, Presiding Judge:
The plaintiff is the Railway Labor Executives' Association (RLEA), an association whose members are the chief executive officers of railway labor unions. RLEA brings this suit against Consolidated Rail Corporation (Conrail) and the United States seeking declaratory and injunctive relief. The case centers on the statutory repeal of certain labor protective provisions granted to Conrail employees by earlier statutes.
The Regional Rail Reorganization Act of 1973 (RRR Act),[1] created Conrail and enabled it to succeed seven bankrupt railroads. Title V of the RRR Act freed Conrail[2] from provisions of existing job stabilization agreements[3] and provided for the employee benefits that are the subject of this litigation.[4]
The Staggers Rail Act of 1980,[5] made some reforms in the labor protection provisions of Title V.[6] With enactment of the Northeast Rail Service Act in 1981 (NRSA),[7] the RRR Act's labor protection provisions underwent major reforms. Section 1132 of NRSA set out Congressional findings and declarations in support of NRSA. These included that:
(4) the provisions for protection of employees of bankrupt railroads contained in the Regional Rail Reorganization Act of 1973 have resulted in the payment of *1556 benefits far in excess of levels anticipated at the time of enactment, have imposed an excessive fiscal burden on the Federal taxpayer, and are now an obstacle to the establishment of improved rail service and continued rail employment in the Northeast region of the United States; and
(5) since holding Conrail liable for employee protection payments would destroy its prospects of becoming a profitable carrier and further injure its employees, an alternative employee protection system must be developed and funded.
45 U.S.C. § 1101. Section 1143 enacted new labor protection provisions (in the form of a new Title VII to the RRR Act, 45 U.S.C. § 797 et seq.). Section 1144 of NRSA repealed Title V's employee protection provisions. The plaintiff has brought this suit to attack this repeal of Title V of the RRR Act. Count I of the complaint states that Title V's employee protection provisions were contractual in nature. The plaintiff contends that Congress' repeal of Title V thus violated the due process and taking clauses of the fifth amendment of the United States Constitution.
In Count II of the complaint, plaintiff alleges that Title V was incorporated by reference in a contract between Conrail and the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees (BRAC) and remains binding on Conrail as to those employees. Conrail and BRAC entered into the collective bargaining agreement pursuant to the provisions of Section 504 of the RRR Act, effective July 1, 1979. That agreement provides that protected employees are to be afforded "the benefits as provided in Appendix No. 8 or 9 whichever is applicable." Appendix 8 to the BRAC agreement is a reproduction of Title V of the RRR Act.[8] Plaintiff contends that this agreement incorporated Title V by reference and that Conrail's failure to adhere to Title V's provisions subsequent to its repeal constitutes a violation of the Railway Labor Act.[9]

COUNT ONE

I. The Standard for Review

The issue in Count One of this case is whether Title V created a contractual[10] obligation of the United States or whether the Title V labor protection provisions were instead gratuitous, social welfare benefits. "Congress [is] free to reduce gratuities deemed excessive. But Congress [is] without power to reduce expenditures by abrogating contractual obligations of the United States." Lynch v. United States, 292 U.S. 571, 580, 54 S.Ct. 840, 844, 78 L.Ed. 1434 (1934).[11] Congress' repeal of social welfare legislation violates the due process clause of the Fifth Amendment *1557 only if it is arbitrary and irrational. Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1959). If Title V did create a contract right, however, then the Court must ascertain whether the repeal of Title V violated the taking clause or the due process clause of the fifth amendment.[12]

II. The Existence of a Contract

Title V may be held to create a contract only if such was Congress' clear intent. See FHA v. Darlington, Inc., 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1959); United States Trust v. New Jersey, 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 1515 n. 14, 52 L.Ed.2d 92 (1977). Title V does not expressly purport to create a contract,[13] nor, in the legislative history is it stated that Congress' intent was to create a contract. Hinds v. Conrail, 518 F.Supp. 1350, 1352 n. 2 (Sp.Ct. RRRA 1981), cert. denied, 454 U.S. 1145, 102 S.Ct. 1007, 71 L.Ed.2d 298 (1982). What the legislative history does suggest, and what plaintiff apparently views as dispositive, is that Congress was fully aware that Title V would supersede employee rights that had been collectively bargained for and were, in fact, contractual.
The legislative history of Title V does not indicate that Congress intended Title V to compensate employees for contractual rights forfeited when Conrail was created. In Hinds v. Conrail, 518 F.Supp. 1350 (Sp.Ct. RRRA 1981), Judge Wisdom stated that the Staggers Act labor protective provisions, which amended Title V of the RRR Act, constituted "social welfare legislation" for purposes of Fifth Amendment review. Id. at 1353. That finding was not dicta. On the contrary, the finding that Title V was social welfare legislation was necessary to the Court's decision to apply minimal scrutiny analysis. See id. Although the amendments in Hinds were under equal protection attack, their characterization as noncontractual serves due process analysis as well.
Upon reconsideration, the court finds that the benefits[14] that plaintiffs gave up at the time Title V was enacted did not constitute consideration for the enactment. That the purpose of Title V may have been to secure labor peace and political support for the consolidation, Hinds v. Consolidated Rail Corp., 518 F.Supp. at 1352 n. 2, does not mean that such exchange created a contract. Most labor legislation is a product of political agreements between labor, the carriers, and government. The fact that a statute incorporates a labor management settlement does not make the statute a contract.[15]Cf. Hisquierdo *1558 v. Hisquierdo, 439 U.S. 572, 575, 585, 99 S.Ct. 802, 805, 810, 59 L.Ed.2d 1 (1979).
The plaintiff has argued that Title V differs from social welfare legislation in that Title V benefits were to be conferred on a limited number of people for a limited period of time. As to the question of limitation on the number of beneficiaries, the Supreme Court has found legislation conferring benefits on a limited number of persons to be social welfare legislation. In United States Railroad Retirement Board v. Fritz, 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980), the Court found that Section 231b(h) of the Railroad Retirement Act of 1974 constituted social welfare legislation, id. at 174, 101 S.Ct. at 459, although it provided for benefits for which only a limited number of people were eligible. How long a social welfare program is scheduled to endure does not, in this court's view, alter the program's nature either.
Because the court finds that Title V constituted social welfare legislation, conferring gratuitous, rather than contractual, benefits, the proper standard for review is whether the repeal of Title V was arbitrary and unreasonable. See Flemming v. Nestor, 363 U.S. at 611, 80 S.Ct. at 1372. The court finds that the need to reduce expenditures in order to assure the viability of Conrail, as expressed in the findings and declarations in Section 1132 of NRSA, constitutes an adequate rational basis to support this legislation.

COUNT TWO
In Count Two of the complaint, the plaintiff contends that a collective bargaining agreement between BRAC and Conrail incorporated Title V by reference.[16] The plaintiff argues that the subsequent repeal of Title V did not absolve Conrail of its obligation to provide Title V benefits to BRAC's members. This, plaintiff argues, is because the terms of Title V were, in effect, frozen in the BRAC-Conrail agreement. The inquiry in this count is, thus, whether Conrail remains bound to pay Title V benefits to BRAC's members.
Even if the original Title V was indeed made part of the BRAC-Conrail contract, Congress' subsequent repeal of Title V superseded the terms incorporated by that contract. The question presented here is comparable to that presented by United Transportation Union (UTU) in United Transportation Union v. Conrail (Cannon), 535 F.Supp. 697 (Sp.Ct.RRRA), cert. denied sub nom. Cannon v. Consolidated Rail Corp., 457 U.S. 1133, 102 S.Ct. 2960, 73 L.Ed.2d 1350 (1982). In Cannon, UTU argued that Conrail could sever employees and refuse to fill vacancies thus created, as permitted by Section 702, 45 U.S.C. § 797a, only when such refusal was not inconsistent with collective bargaining agreements. 535 F.Supp. at 700. As noted by the Court in Cannon, the language of the statute does not except those whose agreements with Conrail are inconsistent with the statute's terms. Id. at 703.[17] The language of NRSA applies without qualification to "employees of [Conrail] who were protected by the compensatory provisions of [Title V] *1559 immediately prior to August 13, 1981." 45 U.S.C. § 797(a)(1). It thus is inconsistent with earlier private agreements that provide different employee protections.
Because the employee protection provisions of the BRAC-Conrail agreement are inconsistent with the protections granted by NRSA, the NRSA provisions supersede the private contract benefits. It is well settled that acts of Congress override inconsistent private contracts. Norman v. Baltimore & Ohio R.R., 294 U.S. 240, 306-09, 55 S.Ct. 407, 415-16, 79 L.Ed. 885 (1935); Louisville & N.R.R. Co. v. Mottley (II), 219 U.S. 467, 482, 31 S.Ct. 265, 270, 55 L.Ed. 297 (1911); see generally, Cannon, 535 F.Supp. at 706-07. Moreover, the legislative history indicates that it was Congress' intent to pre-empt any inconsistent collective bargaining agreement. The Conference Report accompanying the bill that became the NRSA states in reference to the House bill that:
[t]he benefits under this section are intended to replace the benefits provided under Title V of the RRR Act. This is the exclusive protection for employees, and any employee protection contained in collective bargaining agreements is replaced by this protection.
127 Cong.Rec. S.9060 (Daily ed. July 31, 1981).
Because the Court finds that Congress' repeal of Title V voided any contractual requirement that Conrail pay Title V benefits, it is unnecessary to ascertain whether the agreement did, in fact, incorporate Title V by reference. Conrail's refusal to pay Title V benefits to members of BRAC did not violate the Railway Labor Act's procedural requirements.
NOTES
[1] Pub.L. No. 93-236, 87 Stat. 985 (1974) (codified at 45 U.S.C. § 701 et seq.).
[2] Section 504(a) of the RRR Act provided that Conrail was to be bound by the collective bargaining agreements of its predecessors as if it had been an original party thereto until new collective bargaining agreements could be negotiated with the representatives of the employees. Existing job stabilization agreements were excepted, however.
[3] The Penn Central Merger Protection Agreements and the Erie Lackawanna Merger Protection Agreement covered contract employees of some railroads in reorganization immediately prior to creation of Conrail by the RRR Act. These agreements included provisions prohibiting transfer of work from one railroad to another or from one seniority district to another. The agreements in effect guaranteed lifetime employment for railroad employees at or very near their place of employment at the time of merger.
[4] Section 505 of Title V provided for monthly displacement allowances to any employee who was deprived of employment by the reorganization, gave transferred employees a number of protections, and provided for separation allowances to employees who voluntarily resigned.
[5] Pub.L. No. 96-448, 94 Stat. 1895 (1980).
[6] Section 501 of the Staggers Act amended Section 505(b) of the RRR Act to provide for different methods of calculating Monthly Displacement Allowances for members of four employee categories. The Staggers Act amendments to the RRR Act were the subject of this Court's decision in Hinds v. Conrail, 518 F.Supp. 1350 (Sp.Ct.RRRA 1981). The plaintiffs in Hinds alleged that the effect of the Staggers Act amendments was to reduce or eliminate the Monthly Displacement Allowance for certain categories of employees. Id. at 1352.
[7] Pub.L. No. 97-35, § 1132 et seq., 95 Stat. 644.
[8] Appendix 9 is a memorandum for the protection of employees of Conrail in Canada.
[9] The plaintiff cites three procedural provisions of the Railway Labor Act, 45 U.S.C. § 151 et seq. Section 2, First, 45 U.S.C. § 152 requires parties to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions. Section 2, Seventh, 45 U.S.C. § 152, provides that "[n]o carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title." Section 6, 45 U.S.C. § 156, provides that parties to major disputes must maintain the status quo until they have exhausted the Act requirements of notice, negotiation, and mediation.
[10] Under Union Pacific R.R. Co. v. United States (Sinking Fund Cases), 99 U.S. 700, 25 L.Ed. 496 (1879), the United States is as much bound by its contract as individuals would be. Id. at 718-19, 25 L.Ed. 496. Moreover, such a binding contractual obligation can arise from a statute, and the obligations created by such a statute cannot be altered unilaterally by subsequent legislation. United States v. Central Pacific R.R. Co., 118 U.S. 235, 236-37, 6 S.Ct. 1038, 1039, 30 L.Ed. 173, 174 (1886).
[11] It is well settled that in cases where Congress attempts to override contracts between two private parties, the "legislation readjusting rights and burdens `between employers and employees is not unlawful solely because it upsets otherwise settled expectations.'" United Transp. Union v. Consolidated Rail Corp., 535 F.Supp. 697, 708 (Sp.Ct.RRRA 1982) (quoting Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976)). Legislation adjusting economic benefits and burdens of private parties is presumed constitutional and the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976) (citations omitted).
[12] The defendants' argument that plaintiff's "settled expectations" have not been upset, even if Title V benefits were contractual, is inapposite. The "settled expectation" language of the Supreme Court in Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 16, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976), reiterated by this court in UTU v. Conrail, 535 F.Supp. 697, 708 (1982), pertains to expectations resulting from private contracts. 428 U.S. at 15, 96 S.Ct. at 2892, 535 F.Supp. at 708. The standard of review for congressional acts alleged to abrogate the federal government's contractual obligations is higher than the standard of review where Congress is alleged to have interfered with contracts between private parties. See UTU v. Conrail, 535 F.Supp. at 706.
[13] The cases that have been found to support findings of legislative contract generally pertain to statutes that expressly create contracts. See, e.g., United States Trust Co. v. New Jersey, 431 U.S. 1, 17-18, 97 S.Ct. 1505, 1515, 52 L.Ed.2d 92 (1977); Perry v. United States, 294 U.S. 330, 348, 55 S.Ct. 432, 434, 79 L.Ed. 912 (1935).
[14] As employees of bankrupt railroads, the plaintiff's employee benefits were of questionable value.
[15] The plaintiff has cited Dodge v. Bd. of Education, 302 U.S. 74, 58 S.Ct. 98, 82 L.Ed. 57 (1937), for the proposition that statutes confirming settlements of disputed rights and defining the terms of the settlements are clearly contracts. The Supreme Court in Dodge illustrated its meaning by reference to New Jersey v. Yard, 95 U.S. 104, 24 L.Ed. 352 (1877) and New Jersey v. Wilson, 11 U.S. (7 Cranch) 164, 3 L.Ed. 303 (1812). 302 U.S. at 78 n. 9. In New Jersey v. Yard, the Court found that a contract existed where the legislature "required ... a formal written acceptance within sixty days or else it became inoperative." 95 U.S. at 115. It is true that in New Jersey v. Yard the statute provided a solution to a dispute between the State of New Jersey and a corporation of whether the state could tax the corporation. The statute in that case, however, additionally set forth express terms of contract. Likewise, in New Jersey v. Wilson, the parties expressly intended to create a contract, and "[e]very requisite to the formation of a contract [was] found." 11 U.S. at 164-65.
[16] Regardless of whether the parties intended their contract to incorporate Title V, such incorporation could not have occurred if, as defendant contends, it was in fact precluded by the terms of Title V itself. Section 504(d) provides that any job stabilization provisions pursuant to the Act may not exceed those established therein. The United States contends that this provision, reenacted as Section 708(a), 45 U.S.C. § 797g, limits job stabilization agreements to those provided for in the statute as amended. The document allegedly incorporated, however, was Title V as it stood at the time of the contract. The defendants' argument stretches the meaning of Section 504(d) since that section originally did not impose any limits other than those in Title V.
[17] Moreover, "Conrail required no authorization from Congress to do what existing agreements permitted." 535 F.Supp. at 704.