898 F.2d 413
 John VOLLMAR; James Mitchell, on behalf of themselves and
all other persons similarly situated, Plaintiffs-Appellants,
v.
CSX TRANSPORTATION, INC., Defendant-Appellee.
John VOLLMAR; James Mitchell, on behalf of themselves and
all other persons similarly situated, Plaintiffs-Appellees,
v.
CSX TRANSPORTATION, INC., Defendant-Appellant.
 Nos. 89-2337, 89-2343.
 United States Court of Appeals,
Fourth Circuit.
 March 8, 1990.
Rehearing and Rehearing In Banc Denied April 3, 1990.
 
 Richard Allison Allen, Zuckert, Scoutt & Rasenberger, Washington, D.C. (Jayme Rizzolo Epstein, Sherrice A. Knisely, Zuckert, Scoutt & Rasenberger, Washington, D.C., on brief), for plaintiffs-appellants.
 Ronald Maurice Johnson, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C. (Donna M. DeSilva, Mark V. Holden, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., Nicholas S. Yovanovic, John W. Tissue, CSX Transp., Inc., Jacksonville, Fla., on brief), for defendant-appellee.
 Before PHILLIPS and WILKINSON, Circuit Judges, and SPENCER, United States District Judge for the Eastern District of Virginia, sitting by designation.
 WILKINSON, Circuit Judge:
 
 
 1
 In this case we must determine whether appellants have a cause of action in contract to recover monies used to fund railroad retirement benefits. Appellants, who are Canadian employees, allege that a 1973 Memorandum of Understanding between railroad management and railroad labor invested them with a contractual entitlement to pension contributions that the employer, CSX Transportation, Inc., is no longer required by statute to make. The district court held that the Memorandum created contract rights in appellants, but denied them recovery because it was foreseeable that the Foreign Service Exclusion of the Railroad Retirement and Tax Acts could render the contract impossible to perform. We hold that appellants' rights to railroad retirement benefits are wholly statutory and that the Memorandum of Understanding created no enforceable rights in appellants to receive monies used to fund such benefits. In so holding, we affirm the judgment of the district court on other grounds.
 
 I.
 
 2
 Appellants John Vollmar and James Mitchell, who are representatives of a class conditionally certified under Fed.R.Civ.P. 23(b)(2),[1] are Canadian employees of CSX Transportation, Inc. (CSXT), a Virginia railroad company. Both Vollmar and Mitchell performed their work for CSXT in Canada. By virtue of the fact that they worked for an American railroad, Vollmar and Mitchell enjoyed a dual entitlement. As Canadian citizens working in Canada, they were at all times covered by the Canada Pension Plan, and nothing about this ruling affects their Canadian pension rights. In addition, like all American railroad workers, their U.S. retirement benefits were governed by the Railroad Retirement Act of 1974 (RRA), 45 U.S.C. Secs. 231a-v (1982 & Supp. V 1987), and funded under the Railroad Retirement Tax Act, 26 U.S.C. Secs. 3201-3233 (1982 & Supp. V 1987), through employer taxes and payroll taxes which employers are required to withhold from employee paychecks. See id. Secs. 3201(a), 3202, 3221(a). The RRA applies to all employees of American railroads for services rendered both within and without the United States. See 45 U.S.C. Sec. 231(d)(1). However, a 1940 amendment to both the Railroad Retirement Act and the Railroad Retirement Tax Act, known as the Foreign Service Exclusion, provides that foreign nationals employed outside the United States by U.S. railroads shall not receive retirement credit if their country requires the carrier to prefer citizens of the host country for employment. See 26 U.S.C. Sec. 3231(d); 45 U.S.C. Sec. 231(d)(3).
 
 
 3
 In 1972, in order to address serious financial problems which threatened the railroad retirement system, Congress directed the principal constituencies affected by the system--rail management and labor--to submit to the appropriate congressional committees their mutual recommendations for corrective legislation. See Railroad Retirement Act Amendments of 1972, Pub.L. No. 92-460, 86 Stat. 765 (1972); Schreiber, The Legislative History of the Railroad Retirement and Railroad Unemployment Insurance Systems 438 (1978). While management and labor were meeting to address Congress' directive, railroad collective bargaining agreements came up for negotiation pursuant to Sec. 6 of the Railway Labor Act (now codified at 45 U.S.C. Sec. 156 (1982)). The parties combined their efforts to achieve a consensus on railroad retirement legislation with their negotiations on a new collective bargaining agreement. The preliminary recommendations of the parties for revision of the railroad retirement system were recorded in the 1973 Memorandum of Understanding, which is the basis for appellants' contract claims in this case.
 
 
 4
 In Part A of the Memorandum, entitled "Railroad Retirement Legislation," the parties agreed to support legislative reform of the railroad retirement system. The proposed amendments would reduce the employees' share of the retirement tax burden by shifting a portion of that tax burden to the carriers. This would have the effect of increasing employee take-home pay. In return, the parties agreed in Part B of their Memorandum, entitled "Collective Bargaining Agreements," that the employees would settle in their forthcoming negotiations for a wage increase of four percent. Part A of the Memorandum was implemented, in large part, by the Railroad Retirement Act Amendments of 1973, Pub.L. No. 93-69, 87 Stat. 162 (1973), and Part B by collective bargaining agreements which remained in effect from April 27, 1973, until December 31, 1974.
 
 
 5
 In 1978, the Canadian government issued regulations implementing changes in the Canadian Immigration Act. These regulations, which in effect required railroads operating in Canada to accord a hiring preference to Canadian citizens, were construed by the Internal Revenue Service to trigger the Foreign Service Exclusion of the Railroad Retirement and Railroad Retirement Tax Acts. See Rev.Rul. 83-184, 1983-2 C.B. 173. The Railroad Retirement Board, which administers the railroad retirement system, took the same view. See General Counsel of Railroad Retirement Board Legal Opinion L-83-79 (March 25, 1983) and L-83-79.1 (May 11, 1983); Railroad Retirement Board Order 84-55 (January 10, 1984). The District of Columbia Circuit affirmed the Board's interpretation of the Foreign Service Exclusion in Ry. Labor Executives' Ass'n (RLEA) v. United States R.R. Retirement Bd., 749 F.2d 856 (D.C.Cir.1984), and Ry. Labor Executives' Ass'n (RLEA) v. United States R.R. Retirement Bd., 842 F.2d 466 (D.C.Cir.1988).
 
 
 6
 The effect of these rulings was that work performed by Canadian employees for U.S. railroads in Canada would no longer be credited toward the 120-month vesting requirement of the Railroad Retirement Act, effective January 1, 1983, and that railroad employers owed no retirement taxes with respect to such service. Canadian employees could elect to leave their taxes in the system and retain their credit toward retirement. Alternatively, employees could receive a refund of taxes they had paid into the system in which case they would receive no credit for service to the extent of any refund. Vollmar and Mitchell received refunds of their retirement taxes--an option not available to U.S. workers--which they applied to a Canadian Registered Retirement Savings Plan. Similarly, U.S. carriers such as CSXT could apply for a refund of railroad retirement taxes which they had contributed. CSXT received a refund, including interest, totalling approximately $7.3 million.
 
 
 7
 Appellants brought this action against CSXT in the United States District Court for the Eastern District of Virginia, seeking damages and injunctive relief for breach of contract and unjust enrichment. They claimed that CSXT failed to make contributions toward their railroad retirement benefits, as it agreed to do in the 1973 Memorandum of Understanding, in return for appellants' acceptance of a smaller (4%) pay increase. According to appellants, since the contract was rendered impossible to perform, they were entitled to restitution or, in the alternative, recovery in quasi-contract. CSXT argued that rights to railroad retirement benefits are wholly statutory and may be altered at any time. Since the Memorandum of Understanding thus created no contractual rights in appellants to receive benefits, it could perforce create no contractual right in the monies that would be provided by CSXT to fund them.[2]
 
 
 8
 The district court found that the 1973 Memorandum of Understanding created enforceable contract rights in appellants. However, the court reasoned that the applicability of the Foreign Service Exclusion, which made the contract impossible to perform, was foreseeable at the time the contract was made. The court concluded that appellants are not entitled to restitution because they should have anticipated that changes in Canadian law could cause Canadian employees to be excluded from the railroad retirement system. The court rejected as inapplicable appellants' theory of unjust enrichment because it found that express contract rights existed. Vollmar v. CSX Transportation, Inc., 705 F.Supp. 1154 (E.D.Va.1989). This appeal followed.
 
 II.
 
 9
 Appellants claim that the 1973 Memorandum of Understanding gives them a contractual entitlement to receive, in cash, the amount of the railroad retirement taxes originally paid by CSXT on their behalf and subsequently refunded to CSXT, as well as the amount CSXT would have had to continue to pay, absent the operation of the Foreign Service Exclusion. We disagree. Appellants' entitlement to retirement benefits is purely statutory. Consequently, the operation of the Foreign Service Exclusion relieves CSXT of any legal obligation for appellants' retirement benefits or their equivalent.
 
 
 10
 The very nature of the railroad retirement scheme makes it clear that "[l]ike Social Security, and unlike most private pension plans," railroad retirement benefits are statutory rather than contractual. Hisquierdo v. Hisquierdo, 439 U.S. 572, 575, 99 S.Ct. 802, 805, 59 L.Ed.2d 1 (1979). See United States R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 174, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1980). The collective bargaining agreements between CSXT and the various unions to which railroad employees belong make no provision for pension benefits. Rather, railroad retirement benefits are awarded and administered according to federal statute. The amount of contribution is set by the Railroad Retirement Tax Act, 26 U.S.C. Secs. 3201-3233, and taxes are paid into a special account in the United States Treasury. 45 U.S.C. Sec. 231n. Like any scheme of social insurance, the amount of taxes paid on behalf of a particular employee does not necessarily correlate with the amount of benefits to which the employee may become entitled. Hisquierdo, 439 U.S. at 574-75, 99 S.Ct. at 804-05. Moreover, some employees never become eligible for benefits because of the 120-month statutory vesting requirement of the Railroad Retirement Act. 45 U.S.C. Sec. 231a. Neither the employee nor the carrier is entitled to a refund of railroad retirement taxes paid on behalf of an employee who never qualifies for benefits. See, e.g., Fears v. United States, 386 F.Supp. 1223 (N.D.Ga.1975) (employees who left railroad industry before vesting not entitled to refund of taxes paid over and above social security even though they would now receive only social security benefits). The program is also wholly administered by the Railroad Retirement Board, a federal agency, which determines an employee's eligibility for benefits and the amount of benefits to be paid. See 45 U.S.C. Sec. 231f. In sum, unlike most pension plans, which are set up privately and are open to negotiation by the parties, the railroad retirement plan is a federally funded and administered social welfare program not alterable by contract.
 
 
 11
 The 1973 Memorandum of Understanding represented nothing more than a political compromise. It reflects the fact that labor and management agreed to support legislation that would shift some of the employees' tax burden for railroad retirement benefits to the employer. However, the ultimate success of that agreement depended upon the independent decision of Congress to enact its terms. Moreover, once embodied in statute, the arrangement was at all times subject to the option of Congress to alter the statutory scheme, Hisquierdo, 439 U.S. at 575, 99 S.Ct. at 805, which it did in 1981 by causing the employees to assume once again a greater portion of the tax burden. Railroad Retirement Amendments of 1981, Pub.L. No. 97-35, 95 Stat. 628 (1981). The parties in fact each kept their part of the political bargain, both in supporting the legislation that was subsequently enacted and in making the contributions required by statute until such contributions were prevented by operation of law.
 
 
 12
 The fact that labor and management make joint legislative recommendations does not transform statutory rights into contractual ones when Congress enacts legislation reflecting their agreement. In fact, much "labor legislation is a product of political agreements between labor, the carriers, and government." Ry. Labor Executives' Ass'n (RLEA) v. United States, 575 F.Supp. 1554, 1557 (Sp.Ct.R.R.R.A.1983). However, "[t]he fact that a statute incorporates a labor management settlement does not make the statute a contract." Id. Like all statutory entitlements, railroad retirement benefits are subject to Congress' prerogative to "alter, and even eliminate them at any time." Hisquierdo, 439 U.S. at 575, 99 S.Ct. at 805.
 
 
 13
 Here the position urged by appellants would abrogate Congress' attempt in the Foreign Service Exclusion to protect the interests of American railroad employees working abroad. The exclusion from retirement credits applies to foreign employees whose country of residence requires preferential hiring of its citizens, resulting in American workers not being on an "equal footing" with their foreign counterparts. See RLEA, 842 F.2d at 471-72 n. 8. The sanction imposed by Congress for such preferential hiring is the loss of railroad retirement benefits ordinarily provided in the United States to foreign workers. We refuse to restrike the legislative balance by requiring CSXT to refund retirement benefit contributions in derogation of this statutory scheme.
 
 III.
 
 14
 Appellants also claim recovery in quasi-contract,[3] arguing that CSXT would be unjustly enriched if permitted to keep the tax refunds and to enjoy future tax savings resulting from application of the Foreign Service Exclusion. Appellants argue that they conferred a benefit upon CSXT by forfeiting a greater than four percent wage increase with the mutual understanding that CSXT would contribute to appellants' retirement benefits. We again disagree. The only mutual understanding evidenced by the 1973 Memorandum is that both parties would support legislation and enter into certain collective bargaining agreements. Since appellants' entitlement to retirement benefits was at all times statutory, they were only justified in the expectation that CSXT would contribute to their retirement benefits so long as the applicable statute permitted or required CSXT to do so. As in the case of contract recovery, appellants' theory would allow private parties to preempt congressional action in the context of a statutory public benefits program.IV.
 
 
 15
 The 1973 Memorandum of Understanding has created no contractual entitlement to the monies sought by appellants, and the operation of the Foreign Service Exclusion has foreclosed any avenue of statutory relief. This conclusion is wholly sufficient to resolve this case. We find it unnecessary to reach the other questions raised by the district court. The judgment of the district court is
 
 
 16
 AFFIRMED.
 
 
 
 [1]
 The district judge certified the class conditionally because appellees dispute appellants' standing, as individuals in a unionized industry, to assert the claims
 
 
 [2]
 CSXT also contended that, in any case, appellants' claims were procedurally barred because: (1) only the unions, not appellants, had standing to pursue these claims; (2) appellants' claims should have been arbitrated; (3) appellants' claims were time barred by any applicable statute of limitations. Because we find that no contract rights existed, we find it unnecessary to address these issues
 
 
 [3]
 The district court dismissed appellants' unjust enrichment claim, which was, technically speaking, not appealed. However, the quasi-contract theory was discussed at oral argument and the claim of restitution which appellants press in their brief bears a sufficiently close relationship to recovery in quasi-contract that we address it here