**CONSOLIDATED RAIL CORPORATION,**
Plaintiff,

v.

**UNITED TRANSPORTATION UNION, Brotherhood of Locomotive Engineers, and International Brotherhood of Electrical Workers, Defendants.**

**Civ. A. No. 83–16.**

Special Court,
Regional Rail Reorganization Act of 1973.

Dec. 21, 1990.

Neal D. Mollen, Morgan, Lewis & Bockius, Washington, D.C., for plaintiff Consolidated Rail Corp.

Harold A. Ross, Ross & Kraushaar Co., L.P.A., Cleveland, Ohio, for defendants Brotherhood of Locomotive Engineers and R.W. Godwin.

David J. Strom, Highsaw, Mahoney & Clarke, P.C., Washington, D.C., for defendants International Broth. of Elec. Workers and Peter A. Puglia.

Clinton J. Miller, III, Asst. Gen. Counsel, United Transp. Union, Cleveland, Ohio, for defendants United Transp. Union and F.R. Pickell.

Before GASCH, P.J., BRYANT and WEINER, JJ.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

### I. Introduction

Once again we revisit the consequences resulting from the passage by Congress of the Northeast Rail Service Act of 1981 ("NRSA"). On October 7, 1983, plaintiff Consolidated Rail Corporation ("Conrail") filed a complaint against the United Transportation Union ("UTU"), the International Brotherhood of Electrical Workers ("IBEW"), the Brotherhood of Locomotive Engineers ("BLE") and their general chairmen. These unions had each sought to arbitrate certain claims for job protection arising out of Conrail's decisions to abandon certain rail and telecommunication services. The complaint seeks a declaratory judgment, injunctive relief and enforcement of § 708 of the Regional Rail Reorganization Act of 1973 ("the Rail Act"), as added by § 1143(a) of NRSA. Conrail argues that these sections relieve it of the obligation to enter into arbitration of certain disputes which have arisen with the defendant unions.

In their answers to Conrail's complaint, the unions have each raised several counterclaims. IBEW's counterclaim seeks a declaration that Conrail has violated Section 2 First of the Railway Labor Act ("RLA") and § 706 of the Rail Act by not complying with provisions contained in the so-called 1964 Shop Craft Agreement ("the 1964 Agreement") and by not entering into an implementing agreement under § 706. IBEW also seeks an injunction requiring Conrail to pay the compensation required by the 1964 Agreement or, in the alternative, to arbitrate the claims. BLE's coun-

terclaim seeks a declaration that the repeal of Title V did not abrogate Article R–s–2 of its collective bargaining agreement with Conrail. It further argues that the disagreement is one properly for arbitration. Alternatively, it avers that if the Court finds Conrail's position to be correct, we must declare Article R–s–2 of its collective bargaining agreement void for failure of consideration. Finally, UTU's counterclaim seeks a declaration that neither the Rail Act nor NRSA invalidates Article XIII of its January 27, 1972 National Agreement. It also seeks an order directed to Conrail to comply with the Article.

The parties, with the exception of IBEW, have each filed a statement of material facts as to which no dispute purportedly exists. Conrail has, however, filed a counterstatement, challenging several of the unions' contractual interpretations, concerning their respective collective bargaining agreements. As we are able to distinguish between what is stipulated as fact and what is argued as interpretation, we find that no genuine issue of material fact exists and that the matter is ripe for decision as a matter of law. We shall first set out the undisputed facts, then address the claims before the Court. Jurisdiction over the subject matter of this action is appropriate in this Court, pursuant to 45 U.S.C. § 1105.

## II. Facts

1. Conrail is a Pennsylvania corporation. It is a common carrier by railroad engaged in the transportation of goods in interstate commerce.

2. UTU is an unincorporated association. It is the duly designated representative under RLA of the crafts or classes of conductors, brakemen, switchmen and yardmasters. S.T. Malizia was, at the time this action was filed, General Chairman of the UTU General Committee of Adjustment. He has since been replaced by F.R. Pickell.

3. IBEW is an unincorporated association. It is the duly designated representative of certain employees in the non-operating crafts or classes of employees, particularly, electricians, mechanics, helpers and apprentices. P.A. Puglia is the IBEW General Chairman for Conrail.

4. BLE is an unincorporated association. It is the duly designated representative of certain employees in operating crafts or classes, particularly, engineers. D.F. Riley was, at the time this action was filed, the General Chairman of the BLE General Committee of Adjustment.

5. Section 504(a) of the Rail Act, which was repealed effective September 1, 1981 by Section 1144(a) of NRSA, required Conrail to be a successor to its predecessor railroads' collective bargaining agreements. It was required, with one exception, to apply those agreements as though an original party thereto, until completion of single collective bargaining agreements, as required by Section 504(d). The one exception to the successorship requirement was that "the Agreement of May 1936, Washington, D.C. and provisions in other existing job stabilization agreements shall not be applicable to transactions effected pursuant to this Act with respect to which the provisions of section 505 of this title shall be superseding and controlling." 45 U.S.C. § 774(a) (repealed).

6. Section 504(d) of the Rail Act (formerly 45 U.S.C. § 774(d)) provided for the negotiation of new collective bargaining agreements for each craft or class of employees and further directed that those agreements "shall include appropriate provisions concerning rates of pay, rules and working conditions but shall not include any provisions for job stabilization resulting from any transaction effected pursuant to the Act which may exceed or conflict with those established or prescribed herein." 45 U.S.C. § 774(d) (repealed). Section 504(d) was also repealed effective September 1, 1981 by Section 1144(a) of NRSA.

7. Section 706 of the Rail Act, 45 U.S.C. § 797e, was added by Section 1143(a) of NRSA, effective August 13, 1981. Section 706 reenacted former Section 503 of the Rail Act so that Conrail "shall have the right to assign, allocate, reassign, reallocate and consolidate work formerly performed" on the rail properties acquired by

Conrail from the former railroads in reorganization, if such action

does not remove such work from coverage of a collective bargaining agreement and does not infringe upon the existing classification of work right or any craft or class of employees at the location or facility to which such work is assigned, allocated, reassigned, reallocated or consolidated.

It is the position of the unions that, before this authority could be exercised, Conrail was required to negotiate an agreement permitting the involved employees "the right to follow their work." Conrail disputes this interpretation. By reason of § 797e(b), Conrail's right to assign work expires when the funds provided for termination allowances in § 797 are no longer available.

8. Section 708 of the Rail Act, 45 U.S.C. § 797g, was also added by Section 1143(a) of NRSA. Section 708 reenacted former Section 504(d) and continued the requirement of a new single collective bargaining agreement for each class and craft of employees within 45 days after the enactment of Title VII of the Rail Act. Section 708(a) also continued the Section 504(d) prohibition on the inclusion of job stabilization provisions in the single collective bargaining agreements for each class and craft of employees. Further, it prohibited the employees of Conrail from proposing in collective bargaining, under Section 6 of the RLA, the negotiation of job stabilization or other protective agreements until after April 1, 1984.

9. On January 27, 1972, UTU and the National Railway Labor Conference ("NRLC"), which represented most of the nation's railroads, including the predecessor railroads of Conrail, entered into a national agreement.[1] Article XII of the UTU–NRLC 1972 National Agreement authorized the carriers to establish interdivisional service, in accordance with the procedures therein. In accordance thereto, Conrail and UTU entered into a collective bargaining agreement, dated November 7, 1980, providing for interdivisional service between Indianapolis, Indiana, and Crestline, Ohio, via Bellefontaine, Ohio, which is within Conrail Seniority Districts C and D.

10. Article XIII of the 1972 Agreement provided for up to six years of wage protection, in the form of displacement or dismissal allowances, separation allowances and relocation benefits for employees, regardless of seniority, who were adversely affected by the application of Article XII of the 1972 Agreement.

11. On or about March 5, 1981, the Indianapolis–Crestline interdivisional service commenced. Thereafter, UTU demanded that Conrail pay job stabilization benefits, pursuant to Article XIII, to approximately 52 trainmen which UTU generally alleges were adversely affected by the interdivisional service, but not eligible for Title V employee protection benefits. Conrail initially denied all the claims and refused to arbitrate, based on the bar on job stabilization benefits contained in §§ 504(a) and (d) of the Rail Act. After the new single collective bargaining agreement between Conrail and UTU was finalized, Conrail again denied the claims for the additional reasons that: (1) the agreement superseded the 1972 National Agreement; and (2) the new bar on job stabilization benefits contained in the new § 708 reiterated those contained in §§ 504(a) and (d).

12. On or about March 14, 1979, Conrail and IBEW signed a single collective bargaining agreement, pursuant to § 504(d) of the Rail Act. Paragraph 1.F of Appendix C thereto incorporated into the agreement, with one exception, the 1964 Shop Crafts Agreement. The exception was that Article I of the 1964 Shop Crafts Agreement was not incorporated, to the extent set forth in § 504(d).

13. On or about January 12, 1983, defendant Puglia demanded that Conrail pay job stabilization benefits to five employees represented by IBEW, pursuant to Article I of the 1964 Agreement. IBEW alleged that the five were entitled to benefits because of Conrail's alleged leasing or pur-

---

**1.** Effective April 1, 1976, the UTU–NRLC 1972 National Agreement became applicable to Conrail subject to any limitations contained in the Rail Act, including Section 504(a).

chasing of telecommunications lines or equipment on the former Erie Lackawanna Railway from Salamanca, New York, through Pennsylvania, to Youngstown, Ohio.

14. On or about March 1, 1983, defendant Puglia demanded that Conrail pay job stabilization benefits to fifty-six employees represented by IBEW, pursuant to Article I of the 1964 Agreement. IBEW alleged that the fifty-six were entitled to benefits because of the alleged closing of Bison Yard, near Buffalo, New York.

15. Conrail denied both the IBEW's Bison Yard claims and the Salamanca–Youngstown claims.

16. On or about May 27, 1983, Puglia filed on behalf of IBEW its Salamanca–Youngstown claims before Special Board of Adjustment No. 570. SBA 570 is an adjustment board under § 3 Second of the Railway Labor Act and established by Article VI of the 1964 Agreement.

17. On or about June 16, 1983, Conrail advised SBA 570 of its position that the Salamanca–Youngstown claims were barred by § 708 and former § 504 of the Rail Act. Conrail further advised SBA 570 of its position that the board lacked jurisdiction over the claims because Article I of the 1964 Agreement did not bind Conrail.

18. Conrail and BLE negotiated a single collective bargaining agreement, pursuant to § 504(d), effective February 1, 1979.

19. In accordance with Article R–s–2 of the BLE Single Agreement, on or about February 10, 1982, Conrail instituted intradivisional service between Syracuse, New York, and Massena, New York. Conrail also instituted intradivisional service between Buffalo, New York, and Selkirk, New York. Both the Syracuse–Massena and the Buffalo–Selkirk intradivisional services are within Conrail Seniority District F. Articles R–s–2j(8)(A) and (B) provide employee protection conditions applicable on runs operating through an established home terminal.

20. Defendant Riley has demanded that Conrail pay job stabilization benefits, as provided by Article R–s–2, to three employees represented by BLE, one who has been affected by the Syracuse–Massena service and two who have been affected by the Buffalo–Selkirk service. Conrail initially denied the claims submitted for the three. Riley then submitted them to SBA 894. After first asserting that the claims should be so submitted, Conrail subsequently refused to arbitrate the claims on the ground that this Court had exclusive jurisdiction over the interpretation and application of § 708 of the Rail Act and old §§ 504(a) and (d).

### III. Discussion

#### a. Statutory background

The disputes which have formed the basis of this action arise out of the various Congressional enactments designed to insure continued, profitable freight rail service to the Northeastern United States. As stated, Conrail was initially established pursuant to the Rail Act to be the successor to the area's bankrupt railroads. The Rail Act contemplated that Conrail would assume all existing collective bargaining obligations until such time that new agreements could be negotiated. As part of the statutory scheme, Congress sought to limit job stabilization obligations as a means of keeping down Conrail's costs should it decide to streamline or otherwise reorganize its operations.

In pursuit of this goal, Congress enacted § 504(d) of the Rail Act. It provided that job stabilization requirements in collective bargaining agreements could not exceed or conflict with those Congress itself established in Title V of the Rail Act. 45 U.S.C. § 774(d) (repealed). Title V allowed an employee who was deprived of employment to receive a monthly displacement allowance until he reached the age of 65, if the employee had five years of service on January 2, 1974, the effective date of the Rail Act. 45 U.S.C. § 775(c) (repealed). If the employee had less than five years of service on January 2, 1974, the benefits would continue for a period equal to his total prior years of service.

The statutory scheme provided by Title V proved to be more costly than Congress

had anticipated. By 1980, the $250 million dollars appropriated by Congress to fund Title V benefits through the year 2021, had been exhausted. *See, Consolidated Rail Corp. v. Hinds*, 512 F.Supp. 1331, 1332 (Regional Rail Reorg.Ct.1981). Title V was, therefore, amended by the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895. Section 703(c) of the Staggers Act required Conrail to submit to Congress "an analysis of the effects upon the corporation and its employees of alternative changes in labor agreements and related operation changes." In that analysis, Conrail estimated that continuation of Title V payments through 1986 would require expenditure of an additional $374 million. *Conrail, Labor Report to Congress: Response to Staggers Act Section 703(c)* at 28 (March 15, 1981).

In response to Conrail's Staggers Act report, Congress enacted the Northeast Rail Service Act. In passing the legislation, Congress made specific findings that

> the provisions for protection of employees of bankrupt railroads contained in the Regional Rail Reorganization Act of 1973 have resulted in the payment of benefits far in excess of levels anticipated at the time of enactment, have imposed an excessive fiscal burden on the Federal taxpayer, and are now an obstacle to the establishment of improved rail service and continued rail employment in the Northeastern region of the United States; and
>
> since holding Conrail liable for employee protection payments would destroy its prospects of becoming a profitable carrier and further injure its employees, an alternative employee protection system must be developed and funded.

45 U.S.C. § 1101(4), (5). Congress, therefore, replaced Title V with the far less generous provisions of Title VII. Congress' purposes in enacting NRSA included the ending of government subsidies to Conrail by a date certain and the orderly return of Conrail freight service to the private sector. 45 U.S.C. § 1102.

### b. Were Conrail's actions "transactions" under Title VII?

■ As a threshold matter, the unions aver that the provisions of Title VII do not apply to the instant dispute because the actions of Conrail which the unions seek to arbitrate are not "transactions," as the term is used in Title VII. We disagree.

In § 504(d) of the Rail Act, Congress provided that collective bargaining agreements negotiated pursuant to the Rail Act "shall not include any provision for job stabilization resulting from any transaction effected pursuant to this Act which may exceed or conflict with those established herein." 45 U.S.C. § 774(d). The unions read this provision narrowly to only include the transactions that directly resulted in the establishment of Conrail out of the ashes of its predecessor railroads. Such an interpretation, however, would not comport with Congress' intent to make Conrail profitable, end its government subsidies by a date certain and return its freight service to the private sector.

Rather, we find § 504(d) must be read broadly to effectuate the whole of § 302 of the Rail Act. 45 U.S.C. § 742. Not only did that section empower Conrail to acquire the rail properties of its predecessors, but also to rehabilitate, improve and modernize those properties to maintain adequate and efficient rail services. The actions taken by Conrail that form the bases of the instant dispute, *i.e.*, to open new intradivisional and interdivisional services, close Bison Yard and to replace telecommunication lines, are consistent with its mandate under § 302. They are, therefore, transactions subject to the Act.

### c. Did Congress intend to grandfather the unions' agreements?

■ Conrail argues that, in passing NRSA, Congress provided the cap for all job stabilization benefits that could be included in collective bargaining agreements. Conrail contends that all the unions' claims are based on provisions that conflict with Title VII and, therefore, are unenforceable. The unions' arguments are not that their agreements do not conflict with Title VII,

but that those agreements were not abrogated by the passage of Title VII, because they complied with the old Title V. As such, the unions argue, the terms of those agreements were grandfathered by Congress when it enacted § 708(b)(2).

The basis of this argument is the admonition of Congress, in § 708(b)(2), that

> nothing in this section shall be construed to require the parties to enter into a new single line collective bargaining agreement if the agreement in effect immediately prior to the effective date of this title complied with section 774(d) of this title [Section 504(d) of the Rail Act] as in effect immediately prior to such date.

45 U.S.C. § 797g(b)(2). The unions interpret the section as Congressional validation of the job stabilization provisions contained in the collective bargaining agreements negotiated pursuant to the passage of Title V, as long as the provisions do not conflict with or exceed the cap of Title V. Why else, they ask, would Congress not have required new collective bargaining agreements? While this argument has some facial appeal, it ignores Congress' clear intent in enacting Title VII to make it the exclusive source of job stabilization benefits in order to reduce Conrail's and the Federal taxpayers' liabilities for such benefits.[2]

The legislative history of NRSA is complex. *See, Railway Labor Executives' Assn. v. Southeastern Pennsylvania Transp. Authority,* 534 F.Supp. 832, 844, n. 14 (Regional Rail Reorg.Ct.1982), *cert. denied, Southeastern Pennsylvania Transp. Authority v. Railway Labor Executives' Assn.,* 456 U.S. 990, 102 S.Ct. 2271, 73 L.Ed.2d 1285 (1982). Although the Explanatory Statement of the House and Senate conferees is silent on the purposes of § 708(b)(2), the conferees were explicit in stating Congress' intention that

Title VII be the exclusive source of labor protection benefits. The conferees stated

> The benefits under [§ 701] are intended to replace the benefits provided under Title V of the 3R Act. This is the exclusive protection for employees and any protection contained in collective bargaining agreements is replaced by this protection.

Statement of House and Senate Conferees With Respect to Subtitles E, F, and G of Title XI of the Omnibus Reconciliation Bill (H.R. 3982), *reprinted in* 127 Cong.Rec. § 9060 (July 31, 1981). Our prior cases have consistently reached this same conclusion.

In *Railway Labor Executives' Assn. v. United States,* 575 F.Supp. 1554 (Regional Rail Reorg.Ct.1983), *cert. denied,* 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984), we determined that Title V constituted social welfare legislation, conferring gratuitous, rather than contractual, benefits. From this premise, we concluded that the repeal of Title V and implementation of Title VII was constitutional, as it was not arbitrary or unreasonable. We also determined that the plaintiff's argument, that its entitlement to Title V benefits survived the repeal of the statute because its collective bargaining agreement incorporated by reference Title V's provisions, was without merit. We concluded that Congress' subsequent repeal of Title V and enactment of Title VII superseded the terms allegedly incorporated by that particular contract.

We based our decision in *Railway Labor Executives' Assn. v. United States* on our prior decision in *United Transp. Union v. Consolidated Rail Corp.,* 535 F.Supp. 697 (Regional Rail Reorg.Ct.), *cert. denied sub nom, Cannon v. Consolidated Rail Corp.,* 457 U.S. 1133, 102 S.Ct. 2960, 73 L.Ed.2d 1350 (1982). In *Cannon,* we determined that Conrail's power to terminate employees without filling the vacated positions

---

**2.** While we need not address the unions' § 708 argument at length, we do note that the validity of the argument is compromised by Congress' explicit provision that any job stabilization provisions in existing agreements that exceeded Title VII would be automatically preempted. Because those provisions were declared unenforce-

able as a matter of law to the extent they exceeded Title VII, Congress may well have intended that any re-negotiation, for the purpose of trimming benefits to Title VII levels, would have been a waste of labor-management good will.

was not limited by certain collective bargaining agreements because Congress intended that NRSA supersede contrary agreements. We stated that "the language and evident purpose of the statute and the committee reports [left] no room for even the smallest doubt" that NRSA was intended to supplant non-compatible contractual provisions. 535 F.Supp. at 705.

Also relevant is our discussion in *Railway Labor Executives' Assn. v. Grand T.W.R. Co.*, 594 F.Supp. 758 (Regional Rail Reorg.Ct.1984) and *Transportation Communications International Union v. National R. Passenger Corp.*, 718 F.Supp. 74 (Regional Rail Reorg.Ct.1989). In both those cases we determined that the passage of Title VII *did not* abrogate the respective carriers' obligations to continue to provide Title V benefits. However, those cases involved carriers which we found were not the intended target of Congress in enacting Title VII. We stated

Because no new protections were enacted for the employees of the private carriers, there is no statutory provision with which the private contracts could be found to be inconsistent. This failure to provide for alternative benefits, *by contrast with Congress' provision of new benefits for Conrail employees,* suggests that it was not intended to override any private contract provisions.

. . . . .

The lack of provision for any alternate benefits for employees of private carriers, *along with the concern expressed in the legislative history for Conrail's financial situation* without reference to the situations of private carriers, leads to the conclusion that NRSA Section 1144 is not a Congressional abrogation of the private contracts between these parties.

*Grand T.W.R. Co.*, 594 F.Supp. at 761 (emphasis added).

Read as a whole, our cases make clear that Congress' repeal of Title V, and substitution of Title VII, superseded any inconsistent terms allegedly incorporated into

collective bargaining agreements of employees for whom Title VII benefits are available. Thus, the unions' arguments that their agreements with Conrail were grandfathered by Congress when it enacted § 708(b)(2) and hence do not conflict with Title VII because they complied with Title V are without merit. We therefore turn to the question of whether the specific contractual benefits at issue here exceed Title VII. We find that they do.[3]

#### d. Title VII compared with the agreements

Title VII provides that Conrail "may terminate the employment of certain employees ... upon the payment of an allowance of $350 for each month of active service with the Corporation ... but in no event may any such termination allowance exceed $25,000." 45 U.S.C. § 797a. Title VII makes no provisions for the payment of displacement allowances.

■ Article I, Section 5 of the IBEW's Shop Craft Agreement provides for a displacement allowance calculated to be the "the total compensation received by the employee ... during the last twelve months" divided by twelve "thereby producing the average monthly compensation and average monthly time paid for, which shall be the minimum amounts used to guarantee the displaced employee...." Section 6 provides for payment of dismissal allowances for up to five years. Exhibit 1 to Motion of Defendant IBEW for Summary Judgment. As the agreement provides for minimum dismissal benefits, without providing for a monthly or total benefit ceiling, as well as displacement benefits, we find it is inconsistent with the monthly and total dismissal only benefit provisions of Title VII. It is, thus, unenforceable as a matter of law.

Article R–s–2(j)(8) of BLE's Single Collective Bargaining Agreement effective February 1, 1979, incorporates by reference §§ 6 through 11 of the Washington Job

---

**3.** From the content of the unions' memoranda, it may be perceived that they do not seriously challenge that the provisions of their respective agreements exceed that provided in Title VII. However, so that there is no question left remaining, we will take up the issue.

Protection Agreement of May 1936. Section 6(c) thereof provides for a displacement allowance equal to the difference between the employee's average monthly compensation, determined over the prior twelve months and his actual compensation due to his displacement. Section 7, as modified by Article R–s–2, provides for a dismissal allowance equivalent to 100 percent of the employee's average monthly compensation, payable for up to five years. Again, as the agreement provides for minimum benefits but does not provide for a monthly or total benefit ceiling, and provides for displacement allowances, we find it is inconsistent with the monthly and total dismissal only benefit provisions of Title VII. It is, thus, unenforceable as a matter of law.

■ Article XIII of the UTU's 1972 National Agreement provides for a benefit period of up to six years for employees covered under § 2(b) of the Agreement and for a benefit period equal to the length of time of the employee's seniority, up to age 65, for employees covered under § 2(a) of the agreement. Section 3 provides that a displacement allowance shall be "equal to the difference between the monthly compensation received ... in the position in which he is retained and the average monthly compensation received ... in the position from which he was displaced". Section 4 provides that a dismissal allowance shall be "equivalent to one-twelfth of the compensation received ... in the last 12 months ... which is earned compensation prior to the date he is first deprived of his employment as a result of the transaction." Exhibit D to Declaration of F.R. Pickell. As the Agreement provides for a period of benefits longer than that allowed by Title VII, does not provide for a monthly or total benefit ceiling, but does permit displacement allowances, we find it, too, is inconsistent with the provisions of Title VII. It is, thus, unenforceable as a matter of law.

### e. The unions' additional arguments

Two additional arguments have been raised by the unions in their briefs. First, BLE and UTU argue that if job stabiliza-tion benefits are not available as provided in their agreements, the Court should enjoin the continuation of the intradivisional and interdivisional services which constituted the transactions giving rise to these disputes. The argument is that the subject agreements would be void for lack of consideration. Second BLE argues that its agreement is not a job stabilization provision, as contemplated by Title VII, and thus the limitations of Title VII do not apply. We find these arguments to be without merit.

■ First, that the job stabilization provisions of the agreements are unenforceable does not render the entirety of collective bargaining agreements void for failure of consideration. The agreements contain numerous other terms governing operational accommodations, methods for allocating work and the basis for compensating the covered employees. It is hornbook law that when there is a failure of only a part of a lawful consideration, the part which failed is simply a nullity and imparts no taint to the residue. If there is substantial consideration left it will still be sufficient to sustain the contract. 17 C.J.S. *Contracts*, § 130 (1963). The unions' argument that the agreements are void for failure of consideration is, therefore, without merit.

■ BLE's additional argument that its Agreement is not a job stabilization provision is likewise without merit. Section R–s–2(j)(8) plainly provides that "any engineer adversely affected ... as a result of establishing [intraseniority or interseniority district road service through an established home terminal] ... shall receive the protection afforded by [the Washington Agreement]." The argument that the Washington Agreement is not a job stabilization agreement because it does not require Conrail to *maintain* jobs misses the point. The Agreement requires the payment of benefits in the event Conrail displaces or dismisses employees. It thus falls within the ambit of Title VII's limitations.

### IV. Conclusion

We find that the job stabilization provisions contained in the subject collective

bargaining agreements are inconsistent with the provisions of Title VII of the Rail Act, as enacted by Congress in NRSA. Thus, we will in the order which follows, grant Conrail's request for declaratory relief seeking enforcement of § 708 of the Rail Act.

### ORDER

The motion for summary judgment of plaintiff Consolidated Rail Corporation is GRANTED.

The motion for summary judgment of defendant United Transportation Union and S.T. Malizia is DENIED.

The motion for summary judgment of defendant International Brotherhood of Electrical Workers and P.A. Puglia is DENIED.

The motion for summary judgment of defendant Brotherhood of Locomotive Engineers and D.F. Riley is DENIED.

Judgment is ENTERED in favor of plaintiff Consolidated Rail Corporation and against defendants United Transportation Union, S.T. Malizia, International Brotherhood of Electrical Workers, P.A. Puglia, Brotherhood of Locomotive Engineers and D.F. Riley.

The Court DECLARES that the job stabilization provisions contained in Article I, Section 5 of the IBEW's 1964 Shop Craft Agreement, Article R–s–2(j)(8) of BLE's Single Collective Bargaining Agreement effective February 1, 1979 and Article XIII of the UTU's 1972 National Agreement are inconsistent with the provisions of Title VII of the Regional Rail Reorganization Act of 1973, as amended by Congress in the Northeast Rail Service Act of 1981, and are, therefore, unenforceable.

IT IS SO ORDERED.